698 F.2d 456
 18 ERC 1489, 225 U.S.App.D.C. 290, 13
Envtl. L. Rep. 20,251
 DUQUESNE LIGHT COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Alabama Power Company, et al., (Utility Intervenors)
Duquesne Light Company, et al., (Industry Intervenors)
Natural Resources Defense Council, Inc., Intervenors.
 Nos. 80-2103, 80-2123, 80-2160 to 80-2163, 80-2165, 80-2166,
80-2176 to 80- 2181, 80-2185, 80-2186, 80-2188 to
80-2190 and 81-1736.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 9, 1982.
Decided Jan. 7, 1983.
As Amended April 5, 1983.
 
 Petition for Review of an Order of the Environmental Protection agency.
 Andrea S. Bear and Henry V. Nickel, Washington, D.C., with whom Mark G. Weisshaar, Washington, D.C., was on the briefs for Alabama Power Company, et al., petitioners/intervenors in 80-2103, 80-2190 and 81-1736.
 Jeffrey O. Cerar, Washington, D.C., with whom Glenn M. Young, J. Van Carson and Kenneth C. Moore, Cleveland, Ohio, were on the briefs for Morgan Adhesives Co., et al., petitioners in 80-2166, 80-2186, 80-2188 and 80-2189.
 
 
 1
 James E. Fox, Assoc. Gen. Counsel, Knoxville, Tenn., with whom Herbert S. Sanger, Jr., Gen. Counsel, Thomas C. Doolan, Steven A. Brigance and Robert C. Glinski, Knoxville, Tenn., were on the briefs for Tennessee Valley Authority, petitioners in 80-2179.
 
 
 2
 Paul L. Landry, Pittsburgh, Pa., with whom John McN. Cramer, Robert A. Emmett and Lee A. Rau, Pittsburgh, Pa., were on the briefs for Duquesne Light Company, et al., petitioners in 80-2103 and 80-2123.
 
 
 3
 Christopher R. Schraff, Columbus, Ohio, with whom J. Jeffrey McNealey, Robert L. Brubaker, William J. Kelly, Jr., and Charles S. Carter, Columbus, Ohio, were on the briefs for Ohio Edison Company, et al., petitioners in 80-2180 and 80-2181.
 
 
 4
 Roger M. Golden, Chester R. Babst, III, Peter G. Veeder and Louise W. Yoder, Pittsburgh, Pa., were on the briefs for American Iron and Steel Institute, et al., petitioners in 80-2160.
 
 
 5
 Alfred V.J. Prather and J. William Doolittle, Washington, D.C., were on the briefs for Kennecott Corp., petitioner in 80-2161.
 
 
 6
 Ralph J. Moore, Jr., and Frederick C. Schafrick, Washington, D.C., were on the briefs for Magma Copper Company, petitioner in 80-2162.
 
 
 7
 Michael K. Glenn, Washington, D.C., and Rigdon H. Boykin, New York City, were on the briefs for American Paper Institute and National Forest Products Association, petitioners in 80-2163.
 
 
 8
 Thomas H. Truitt, Thomas W. Brunner, D. Michael Freedman and Mark R. Joelson, Washington, D.C., were on the briefs for Ford Motor Company, petitioner in 80-2165.
 
 
 9
 Edmund B. Frost, Patrick C. Joyce and David F. Zoll, Washington, D.C., were on the briefs for Chemical Manufacturers Association, petitioner in 80-2176.
 
 
 10
 Gary H. Baise, Charles A. Patrizia and Scott W. Bowen, Washington, D.C., were on the briefs for Dow Chemical Company, et al., petitioners/intervenors in 80-2103, 80-2177 and 80-2178.
 
 
 11
 Jerome Heckman and Peter De La Cruz, Washington, D.C., were on the briefs for The Society of the Plastics Industry, Inc., et al., petitioners in 80-2178.
 
 
 12
 Frank H. Morison and Roberta L. Halladay, Denver, Colo., were on the briefs for ASARCO, Inc., petitioner in 80-2185.
 
 
 13
 William F. Pedersen, Jr., Atty. E.P.A., Washington, D.C., of the bar of the Supreme Court of Massachusetts pro hac vice by special leave of Court, Christopher C. Herman, Atty. E.P.A., Dean K. Dunsmore and Michael W. Neville, Attys., Dept. of Justice, Washington, D.C., with whom Robert M. Perry, General Counsel, Todd M. Joseph, Atty. Environmental Protection Agency and Donald W. Stever, Jr., Atty., Dept. of Justice, Washington, D.C., were on the briefs for respondent E.P.A., et al., in all cases.
 
 
 14
 Ronald J. Wilson and Richard E. Ayres, Washington, D.C., were on the brief for Natural Resources Defense Council, Inc., intervenor in 80-2103.
 
 
 15
 Paul Rodgers and Charles D. Gray, National Association of Regulatory Utility Commissioners, Washington, D.C., amicus curiae in 80-2103.
 
 
 16
 Before ROBINSON, Chief Judge; MIKVA, Circuit Judge and BAZELON, Senior Circuit Judge.
 
 
 17
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 MIKVA, Circuit Judge:
 
 18
 To speed improvement of the nation's air quality, Congress adopted the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (Amendments). An innovative feature of the 1977 Amendments was the authorization of penalties to recoup the economic benefits derived by pollution sources that fail to comply with air pollution limitations, 1977 Amendments Sec. 120, 42 U.S.C. Sec. 7420 (Supp. IV 1980). Section 120 directed the Administrator of the Environmental Protection Agency (EPA) to promulgate regulations by February 1978 for assessing the noncompliance penalties. Id. Sec. 120(a)(1)(A), 42 U.S.C. Sec. 7420(a)(1)(A) (Supp. IV 1980). EPA's final rules implementing section 120 were adopted nearly a year and one half later. 45 Fed.Reg. 50,086 (1980) (codified at 40 C.F.R. Secs. 66.1 to 67.43 (1981)).
 
 
 19
 In these twenty consolidated cases, industry petitioners seek review of a variety of aspects of the final rules.[1] In nearly all respects, we find that EPA complied with the statutory mandate: to recover the economic benefits of continued noncompliance with air quality standards, swiftly but fairly. Before discussing the merits, it would be useful to outline the statutory plan.
 
 I. THE CLEAN AIR ACT AND SECTION 120
 
 20
 The Clean Air Act (Act) imposes an interlacing set of emission controls on stationary sources of air pollution. National standards limiting levels of pollutants in the air we breathe, termed ambient air quality standards, are set for particular pollutants by EPA. Act Sec. 109, 42 U.S.C. Sec. 7409 (Supp. IV 1980).[2] They are put into effect, by state implementation plans (SIPs), approved by EPA, which limit emissions from particular sources within the state in a manner designed to attain the ambient air quality standards. Id. Sec. 110, 42 U.S.C. Sec. 7410 (Supp. IV 1980). Additional, highly protective federal standards are set by EPA to limit emissions by particular sources of hazardous air pollutants, such as asbestos, that are capable of causing serious injury or death. Id. Sec. 112, 42 U.S.C. Sec. 7412 (Supp. IV 1980); see, e.g., Ethyl Corp. v. EPA, 541 F.2d 1 (D.C.Cir.1976). EPA also sets separate, uniform standards for new stationary sources of emissions under Sec. 111, 42 U.S.C. Sec. 7411 (Supp. IV 1980). These separate standards are designed so that pollution controls will be installed when the plant is being built and design changes are easiest, and so that the states will not compete for new industry by adjusting emissions levels for air pollution.[3]
 
 
 21
 Although the original statutory framework was only put in place in 1970, by 1977 Congress expressed serious dissatisfaction with the slow progress towards improving air quality.[4] Part of the explanation for the slow pace was that the original timetables for developing and implementing air quality standards had been overly optimistic in light of the technological, economic, and political complexities of the problem of air pollution.[5] Another part was that the Act is "technology-forcing":[6] sources must meet emissions standards or else face statutory penalties for continuing operations, regardless of whether available technology enables them to meet the standards. At least as important an obstacle, however, was the expense of reducing emissions, making it profitable for industry to delay needed expenditures as long as possible.[7]
 
 
 22
 With this view of the problem, Congress both revised the substantive standards of the Act and strengthened the methods it provided for enforcing air quality standards. Substantive changes included new provisions for state plans to implement air quality standards in areas of persistent pollution--so-called "non-attainment areas." Act Secs. 171-178, 42 U.S.C. Secs. 7501-7508 (Supp. IV 1980). The Amendments also required the states to set standards to prevent significant deterioration of air quality in areas relatively free from pollution. Id. Secs. 160-169A, 42 U.S.C. Secs. 7470-7491 (Supp. IV 1980). Congress also revised the new source performance standards, requiring new sources to use the best available systems of emissions controls. Id. Sec. 111, 42 U.S.C. Sec. 7411 (Supp. IV 1980).[8]
 
 
 23
 The Act, as established in 1970, provided for criminal fines of up to $25,000 per day or imprisonment of up to one year for knowing violations of standards under the Act. It also empowered EPA to order sources to comply with applicable air quality standards, and to seek injunctive relief for violations of its orders. Pub.L. No. 91-604, Sec. 113(b), 84 Stat. 1676, 1686-87 (1970). The 1977 Amendments added civil penalties to the enforcement scheme. Act Sec. 113(b), 42 U.S.C. Sec. 7413(b) (Supp. IV 1980). Together with these changes in traditional methods, the 1977 Amendments also added section 120 noncompliance penalties to the enforcement scheme of the Act.
 
 
 24
 Section 120 is a unique federal experiment with economic penalties. It is designed to alter economic behavior by changing the costs of emitting pollutants in violation of applicable air quality standards. See H.R.REP. NO. 294, 95th Cong., 1st Sess. 72-79 (1977) [hereinafter 1977 HOUSE REPORT], reprinted in 4 A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977 at 2539-46 (1978) [hereinafter 1977 LEGISLATIVE HISTORY]. Congress added section 120 to the Act because it anticipated that even the augmented civil and criminal penalty scheme would not create sufficient incentives for sources to comply with air quality standards. Id. at 72. Congress also hoped that the section 120 penalties would increase administrative flexibility in enforcing the Act, by serving as a middle ground between stiff criminal sanctions or shutdown of noncomplying facilities. Id. at 5. Equally important, by removing the economic benefits of noncompliance with the Act, Congress hoped to place polluters on the same economic footing as those who had limited their emissions through increased anti-pollution expenditures. Id.
 
 
 25
 Section 120 begins by specifying the sources made subject to noncompliance penalties. Under section 120(a)(2), penalties may be assessed against any major stationary source--defined as any source that emits or has the potential to emit one hundred or more tons of any pollutant per year, Act Sec. 302(j), 42 U.S.C. Sec. 7602(j) (Supp. IV 1980)--not in compliance with any applicable emission limitation. Such penalties also are to be assessed against other stationary sources not in compliance with federal new source performance standards or standards for hazardous pollutants. Finally, sources operating under certain types of delayed compliance orders allowed by the Act are to be assessed penalties if they fail to comply with the terms of such orders.
 
 
 26
 Sources meeting certain conditions, however, are to be exempted from the noncompliance penalties. For example, sources converting from petroleum to coal pursuant to orders issued under the Act, and complying with the terms of such orders, are exempt from noncompliance penalties. Sec. 120(a)(2)(B)(i). So are sources experimenting with innovative technology under the Act, Sec. 120(a)(2)(B)(iii), and certain sources unable to comply with emission limitations for reasons utterly beyond their control, Sec. 120(a)(2)(B)(iv). These exemptions are mandatory, although the burden of demonstrating entitlement to any of them falls on the source. In addition, EPA may exempt sources from penalties for certain instances of noncompliance that are de minimis in nature and duration. Sec. 120(a)(2)(C).
 
 
 27
 Penalties are to be assessed against noncomplying sources either by EPA or by the individual states. Section 120 directs EPA to promulgate regulations implementing the penalties after notice and opportunity for public hearing--the regulations we must evaluate here. Individual states may take over responsibility for administering the noncompliance penalty program if they submit plans approved by EPA, Sec. 120(a)(1)(B)(i), in which case the penalties are paid to the states, Sec. 120(d)(1). To date, however, states have shown little interest in taking responsibility for the program. In any event, the statute does not differentiate substantively between the penalty program as administered by EPA and by the states, and the discussion to follow will for convenience refer principally to EPA as administering the program.
 
 
 28
 Section 120 sets out carefully the procedures to be followed in assessing the noncompliance penalties. Sources not complying with applicable air quality standards are to be given "a brief but reasonably specific notice of noncompliance." Sec. 120(b)(3). Upon receipt of a notice of noncompliance, a source must either calculate the amount of the penalty owed, which begins to accrue with the issuance of the notice of noncompliance, Sec. 120(d)(3)(C)(ii), or submit a petition within forty-five days challenging the notice of noncompliance or asserting entitlement to an exemption. EPA is to provide a hearing on the record and to act on the petition within ninety days.[9] Sec. 120(b)(5). Should a source in receipt of a noncompliance notice fail to respond, EPA may contract for calculation of the penalty. Sec. 120(c).
 
 
 29
 Penalties are to be calculated to reflect the projected economic value of noncompliance to a source. EPA is to promulgate regulations for calculating the penalty, which must include at least the quarterly equivalents of capital costs, operating costs, and maintenance expenses avoided as a result of noncompliance. Sec. 120(d)(2)(A). The penalty is to be paid on a quarterly basis, in equal installments during the entire period of noncompliance, beginning with issuance of the notice of noncompliance and ending when the source comes into full compliance with applicable air quality standards. Sec. 120(d)(3)(B), (C). Expenditures made during a quarter for the purpose of bringing the source into compliance with air quality standards, and not otherwise reflected in the calculation of the penalty amounts, are to be credited against the penalty assessment for that quarter. Sec. 120(d)(2)(B). Credits not taken into account fully in a given quarter may be carried over and offset against the next quarter's penalty assessment. Sec. 120(d)(2). When a source reaches full compliance with air quality standards, the penalty is to be recalculated to take into account the actual--rather than the projected--expenditures required to bring the source into compliance with air quality standards and the length of the actual period of delay in the expenditures. Sec. 120(d)(4). Sources that have overpaid are entitled to reimbursement, at interest rates set by the United States Treasury (or by the state, if the state is administering the penalty program); sources that have underpaid are to be assessed the deficiency, again with interest. Sec. 120(d)(4)(A), (B).
 
 
 30
 Initial penalty payments are due six months after issuance of the notice of noncompliance. A source may seek judicial review of a determination by EPA that penalizes the source under section 120, but the penalty is not stayed pending the review process, Sec. 120(e). The penalties are in addition to other civil and criminal penalties under the Act, and do not alter a source's other obligations under the Act. Sec. 120(f).
 
 
 31
 Before turning to the particular issues in this case, we note that the standard for judicial review is spelled out in the Act itself. Section 307(d)(9) provides that:
 
 
 32
 In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--
 
 
 33
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 34
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 35
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or
 
 
 36
 (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the failure to observe such procedure was raised with reasonable specificity during the period for public comment, and (iii) the failure to observe such procedure was so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such failure had not been made.
 
 
 37
 Sec. 307(d)(9). 42 U.S.C. Sec. 7607(d)(9) (Supp. IV 1980).
 
 
 38
 We have reviewed these regulations with this standard as our measure.
 
 II. THE APPLICABILITY OF SECTION 120
 
 39
 Industry petitioners' challenge to EPA's regulations implementing section 120 begin with the threshold question of which sources are subject to noncompliance penalties. EPA interprets the scope of the statute broadly, while industry petitioners argue for a narrow interpretation.
 
 
 40
 Section 120 provides that noncompliance penalties are to be assessed against "every person who owns or operates" one of three categories of noncomplying sources. The statutory language reads:
 
 
 41
 (i) a major stationary source (other than a primary nonferrous smelter which has received a primary nonferrous smelter order under section 119) which is not in compliance with any emission limitation, emission standard or compliance schedule under any applicable implementation plan (whether or not such source is subject to a Federal or State consent decree), or
 
 
 42
 (ii) a stationary source which is not in compliance with an emission limitation, emission standard, standard of performance, or other requirement established under section 111 or 112 of this Act, or
 
 
 43
 (iii) any source referred to in clause (i) or (ii) (for which an extension, order, or suspension referred to in subparagraph (B), or Federal or State consent decree is in effect), or a primary nonferrous smelter which has received a primary nonferrous smelter order under section 119 which is not in compliance with any interim emission control requirement or schedule of compliance under such extension, order, suspension, or consent decree.
 
 
 44
 Sec. 120(a)(2)(A). Section 120 penalties thus apply most extensively to major stationary sources, which may be liable to pay penalties for failure to comply with any type of air quality standard, interim or permanent, applicable under the Clean Air Act. Other, smaller stationary sources will be assessed penalties only for failures to meet federal new source performance standards, Sec. 111, 42 U.S.C. Sec. 7411 (Supp. IV 1980), federal standards for particularly hazardous pollutants, Sec. 112, 42 U.S.C. Sec. 7412 (Supp. IV 1980), or the types of interim standards listed in subpart (iii).
 
 
 45
 EPA's regulations implementing section 120 specify that a notice of noncompliance--the first step in the penalty assessment process--is to be sent to the owner or operator of any source that is in violation of "applicable legal requirements." 40 C.F.R. Sec. 66.11(a) (1981). The regulations defining the term "applicable legal requirements" track the language of the applicability provisions set out above. See id. Sec. 66.3(c)(1)-(4). Industry petitioners challenge this definition, together with two other EPA interpretations of the applicability provisions. The first of these is EPA's definition of "owner or operator" of a source to include both lessees and supervisory companies of sources not in compliance with applicable legal requirements. Id. Sec. 66.3(i). The second is EPA's broad definition of "potential to emit," a term of art used in deciding which stationary sources are "major." Id. Secs. 66.3(g), (j). We now turn to those definitions.
 
 
 46
 A. "Applicable Legal Requirements"
 
 
 47
 EPA's regulations define "applicable legal requirements" for major sources as follows:
 
 
 48
 (1) In the case of any major source, any emission limitation, emission standard, or compliance schedule under any EPA-approved State implementation plan (regardless of whether the source is subject to a Federal or State consent decree)....
 
 
 49
 40 C.F.R. Sec. 66.3(c) (1981).
 
 
 50
 Industry raises two objections to this definition. The first is that it permits the assessment of penalties against sources operating under consent decrees and complying with their terms, but not yet in compliance with applicable legal requirements. The second is that EPA's regulations dictate that penalties are to be assessed against major sources failing to comply with limits stipulated in state SIPs, even though proposed revisions of the SIPs are pending, and even though EPA has not acted on the revisions within the time limits mandated in the Act. With regard to the first objection, we affirm EPA's determination that section 120 penalties are to be applied to sources operating under consent decrees. With regard to the second, we conclude that EPA's application of section 120 penalties pending SIP revisions must be modified in part.
 
 
 51
 1. Sources in Compliance with Consent Decrees
 
 
 52
 The regulations require noncompliance penalties to be assessed against major stationary sources operating under consent decrees. They explicitly provide that a major source is liable for failures to comply with emission limitations set for that source in the SIP of the state in which the source is located, 40 C.F.R. Sec. 66.3(c)(1) (1981), even though the source has been sued for violation of the limitations in question, the suit has resulted in a consent decree, and the consent decree sets out a schedule for the source to come into compliance with the limitations in exchange for an agreement by EPA not to pursue the civil or criminal penalties set out in the enforcement section of the Act, Sec. 113(c).
 
 
 53
 Industry petitioners concede that the statutory parenthetical "(whether or not such source is subject to a Federal or State consent decree)," Sec. 120(a)(2)(A)(i), permits assessment of noncompliance penalties against some major sources operating under consent decrees. They contend, however, that such penalties may be assessed only in two kinds of cases: (1) if the source fails to comply with a different emission limitation that was not the subject of the consent decree and (2) if the source fails to comply with the terms of the consent decree itself. Petitioners argue that by assessing penalties against major sources for failure to comply with emission limitations that were themselves the subject of consent decrees, EPA has misinterpreted the statutory parenthetical. In the alternative, they contend that if EPA's interpretation of the statute is correct, the statute interferes with previous court decrees in an unconstitutional manner.
 
 
 54
 EPA rested its decision to permit assessment of noncompliance penalties against major stationary sources operating under consent decrees squarely on its reading of the statutory language. 45 Fed.Reg. 50,086-87 (1980). EPA also pointed out that assessing penalties against sources operating under consent decrees would further the purposes of section 120, for sources out of compliance with emissions limitations derive benefits from their noncompliance regardless of whether they have been subject to consent decrees. Id. at 50,087.
 
 
 55
 We think that EPA's interpretation of the statute is sound. Section 120 distinguishes three categories in which noncompliance penalties are to be assessed. See supra pp. 465-466. The disputed parenthetical language appears in the first of these--major sources failing to comply with any SIP limitations. Reference to consent decrees also appears in the third category, which provides for the assessment of penalties against sources failing to comply with the terms of consent decrees or other interim orders. Industry petitioners' reading of the parenthetical--that it principally indicates that penalties may be assessed against sources failing to comply with their consent decrees--accounts only for the reference to consent decrees in the third category. It would render the parenthetical superfluous, for the third category makes absolutely plain that sources failing to comply with consent decrees may be subject to penalties for that very failure. Thus the function of the initial parenthetical is to make clear that consent decrees do not bar the imposition of penalties against major sources in violation of any emission limitation.
 
 
 56
 The legislative history, although limited, also supports the interpretation of the parenthetical chosen by EPA. Section 120 as originally enacted did not include the disputed parenthetical. See Pub.L. No. 95-95, 91 Stat. 714 (1977). The parenthetical was added as one of a number of "technical" amendments to the Clean Air Act Amendments of 1977, in the Safe Drinking Water Amendments of 1977, Pub.L. No. 95-190, Sec. 14(a)(28), 91 Stat. 1401. An item-by-item summary of the technical amendments offered to the House explained that the parenthetical
 
 
 57
 [c]larifies that a noncompliance penalty applies to any noncomplying source (which is not exempted) including a source which has received a Federal or State consent decree extending a final compliance date.
 
 
 58
 123 CONG.REC. 36,331 (1977). The universal scope of the explanation--that penalties are to apply to any source, in spite of a consent decree--clearly expresses the understanding of the statute urged by EPA.[10]
 
 
 59
 Moreover, EPA's interpretation furthers the statutory purpose of section 120: recouping the economic benefits of noncompliance. The legislative history of section 120 repeatedly emphasizes the goal of removing the benefits derived by sources from delayed compliance with the Act. A source under a consent decree reaps such benefits, although the benefits may be expected to shrink as the source follows the course of compliance set out under the decree. Industry petitioners are surely correct that sources would be encouraged to enter consent decrees if the decrees provided shelter from noncompliance penalties, but it does not follow that Congress meant the decrees to abrogate the penalties. The penalties are intended to provide a swift, even-handed, economic incentive for compliance with the Act's standards, but would not do so if sources could escape the penalty by means of consent decrees.
 
 
 60
 Industry petitioners alternative argument is that if we find EPA's interpretation of the parenthetical sound--as we do--we must find the statute itself constitutionally defective. Full statement of their constitutional concerns requires further description of the enforcement scheme of the Act.
 
 
 61
 The Act empowers EPA to order a major stationary source to comply with any applicable SIP requirement. Sec. 113(a). Should the source fail to comply with EPA's order, EPA may sue in federal district court to enforce the order. Sec. 113(b). EPA's power to enforce the provisions of the Act, moreover, is not exclusive. States are under a duty to enforce their implementation plans. Sec. 113(a)(2). States may bring suit either in federal district court or in state court to enforce any emission limitation, provided only that the limitation is at least as stringent as the state's SIP. Sec. 116, 42 U.S.C. Sec. 7416 (Supp. IV 1980). Citizens, too, are "welcome participants in the vindication of environmental interests," Friends of the Earth v. Carey, 535 F.2d 165, 172 (2d Cir.1976), cert. denied, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); see also Metropolitan Washington Coalition for Clean Air v. District of Columbia, 511 F.2d 809 (D.C.Cir.1975), and may bring suit in federal district court against any person, including the United States, in violation of any emission standard, Sec. 304(a), 42 U.S.C. Sec. 7604(a) (Supp. IV 1980), unless EPA or the state has brought suit to compel compliance, Sec. 304(b)(1)(B). See Baughman v. Bradford Coal Co., 592 F.2d 215 (3d Cir.1979) (federal district court has jurisdiction of citizen suit to enforce emission limitation despite fact that action by Pennsylvania Department of Environmental Resources is pending before Pennsylvania Environmental Hearing Board, an entity lacking full enforcement powers of federal courts).
 
 
 62
 Suits brought by any of these plaintiffs--EPA, the individual states, or private citizens--may terminate with consent decrees. In the case of a suit brought by EPA or the state, such decrees typically set out a schedule for compliance by the source in settlement of the source's further liability for civil and criminal penalties under the Act for the violations at issue.[11] EPA may intervene as of right in a suit brought by a private citizen, Sec. 304(c), and there, too, the consent decree may settle the source's then-existing liability for civil or criminal penalties under the Act.
 
 
 63
 Consent decrees entered into before the 1977 Amendments to the Act of course do not mention or purport to settle the section 120 noncompliance penalties. Since 1977, consent decrees entered into by states have been required to include notice to the source that it may be assessed noncompliance penalties despite the fact that the decree sets out a schedule for delayed compliance with SIP requirements, Sec. 113(d)(1)(E).[12] In the rulemaking at issue here, EPA announced its intention not to enter into any consent decrees without explicit provision that the source may be required to pay noncompliance penalties unless exempted by EPA. Notice of Proposed Rulemaking, 44 Fed.Reg. 17,315 (1979). Nevertheless, in some cases EPA has continued to enter into consent decrees that neither settle section 120 penalties nor give notice that they may continue to be assessed,[13] so that EPA's present practice is not quite clear.
 
 
 64
 Industry petitioners' principal constitutional complaint is that by assessing a noncompliance penalty against a source subject to a consent decree, EPA interferes with the res judicata effect of the decree, in violation of the separation of powers. Petitioners' position is that EPA, should it wish to assess a penalty, may do so only by petitioning the issuing court for modification of the decree. Although petitioners are correct that consent decrees, like final judgments, do have a res judicata effect, they misconstrue the statutory situation.
 
 
 65
 Congress always has the power to impose a new penalty on continuing activity. Here, under its power to regulate interstate commerce,[14] Congress has imposed a new penalty. As it specifically noted in passing this section, "[a]ny orders, payments, sanctions, or other requirements under [section 120] shall be in addition to any other permits, orders, payments, sanctions, or other requirements established under this Act." Sec. 120(f). Thus, when EPA promulgated its regulations, it was not seeking to relitigate, revise, or otherwise overturn a validly entered consent decree; rather, it was merely acting in furtherance of the additional, constitutionally proper, mandate Congress gave it in the 1977 Amendments.
 
 
 66
 Industry petitioners raise two other constitutional objections to the imposition of section 120 penalties on sources operating under consent decrees. Each can be disposed of quickly. First, petitioners argue that imposition of the penalties without a hearing and findings of fact by the initial issuing court would violate a source's right to due process of law. This argument, however, relies on the mistaken assumption that in imposing the section 120 penalties, EPA is unilaterally revising the terms of consent decrees, rather than imposing a new statutory penalty on a continuing violation. Second, petitioners argue that the imposition of section 120 penalties on sources operating under state court consent decrees violates the tenth amendment by interfering with state judicial proceedings. This argument, too, falters because of its mistaken assumption that section 120 permits the revision of decrees setting liability for prior violations. Petitioners do not argue that the penalties per se are invalid intrusions upon state powers. In applying noncompliance penalties to sources operating under consent decrees, Congress has made a permissible choice: to recoup the benefits of noncompliance from sources that continue to fall short of the Act's standards.[15]
 
 
 67
 2. Sources Claiming Compliance with Pending SIP Revisions
 
 
 68
 Industry petitioners'[16] second major objection to the definition of "applicable legal requirements" in EPA's regulations implementing section 120 is that it allows penalties to be assessed against a major source in violation of current SIP requirements, despite the fact that revisions to the requirements have been proposed and are under consideration by EPA, and despite the fact that the source is in compliance with the proposed revisions. 40 C.F.R. Sec. 66.3(c)(1) (1981). Under the regulations, current SIP provisions continue to be the standard by which compliance is measured. If and when a proposed revision to a SIP is approved by EPA, it becomes the standard by which compliance is measured. A source which comes into compliance with SIP requirements by virtue of a SIP revision will thus cease to be liable for penalties as of the time the SIP revision becomes effective. See Sec. 120(d)(4).
 
 
 69
 EPA's reason for measuring compliance by existing SIP provisions was simple: "Until a SIP revision is formally approved by EPA, the source is under a legal obligation to comply with the SIP that is in effect." 45 Fed.Reg. 50,090 (1980); see also id. at 50,101. Without further explanation, however, EPA also noted that if it determined that a pending SIP revision was likely to be approved, it would assign lower priority to issuing a notice of noncompliance against a source in compliance with the proposed revision. Id. at 50,090. Industry petitioners argue that any definition of "applicable legal requirements" must exclude SIP provisions for which modification is proposed and under consideration by EPA. They argue that this definition is required in order to give adequate importance to the role of the states under the Act.
 
 
 70
 Under the Act, the states and the federal government are to be partners in the task of improving the nation's air quality. The federal EPA is assigned responsibility for developing uniform standards for ambient air quality, for hazardous pollutants, and for new sources. The states have primary responsibility for translating ambient standards into specific rules governing particular pollution sources, given local conditions and needs. Train v. Natural Resources Defense Council, 421 U.S. 60, 79, 95 S.Ct. 1470, 1481, 43 L.Ed.2d 731 (1975). EPA, however, is the ultimate supervisor, responsible for approving state plans and for stepping in, should a state fail to develop or to enforce an acceptable plan. The states, in sum, are to tailor standards to their own conditions, but EPA is to ensure national uniformity where needed, for example, to ensure that states do not compete unfairly for industry by offering air quality standards that are too lax to bring about needed improvement in the air we breathe.
 
 
 71
 As applied to the development of SIPs, the state and federal partnership works as follows. States are to adopt SIPs and to submit them to EPA for review. Sec. 110(a). EPA is to approve a SIP if it finds both that it was adopted after reasonable notice and hearing and that it is substantively adequate to attain and maintain air quality standards. Sec. 110(a)(2). Strict statutory timetables are set for both the states and EPA: states are given nine months from the promulgation of an ambient air quality standard to develop a SIP for its implementation, Sec. 110(a)(1), and EPA in turn is given four months to approve or disapprove the plan, Sec. 110(a)(2). Should a state fail to submit a SIP, or to correct a SIP found deficient by EPA, EPA is empowered to promulgate a plan for the state. Sec. 110(c).
 
 
 72
 The Clean Air Act recognizes that from time to time SIPs will require revision, either because local conditions change or because experience shows that air quality standards can be better met in a manner other than that provided in the original SIP. The Act thus allows for SIP revisions which, like original SIPs, are subject to EPA approval. Sec. 110(a)(3). These revisions, like the original SIP, must be acted upon within four months by the Administrator, Sec. 110(a)(2), or within three months if they are in relation to fuel burning stationary sources, Sec. 110(a)(3)(B).
 
 
 73
 In defining "applicable legal requirements" in terms of current SIPs, EPA rested on the ground that current SIPs remain in force until EPA grants formal approval to a revision. EPA is clearly correct as to the legal status of proposed revisions: they are proposals and nothing more. Otherwise, as this court has noted, states could circumvent requirements of the Act by proposing revisions to their SIPs. Metropolitan Washington Coalition for Clean Air, 511 F.2d at 813. We therefore reject the interpretation petitioners would impose upon EPA: that SIP provisions under review should be excluded from the definition of applicable legal requirements.
 
 
 74
 At the same time, however, we are unable to agree with EPA that it may continue to assess section 120 penalties against sources out of compliance with present SIPs, that would be in compliance with a proposed revision, no matter how long EPA takes to act on the proposed revision. Industry petitioners cite examples of delays of over one year by EPA in acting on proposed revisions. Supplemental Brief of Duquesne Light Company and Pennsylvania Power Company on Issues Regarding Revised "SIP" Provisions at 12. We are not sanguine about the possibility that EPA will act expeditiously on all proposed SIP revisions; for example, we note that although EPA was directed to promulgate the regulations implementing section 120 within six months, Sec. 120(a)(1)(A), it did not do so for nearly three years. See 45 Fed.Reg. 50,086 (1980).
 
 
 75
 Although EPA is correct that a proposed SIP has no legal weight until it is finally approved, the fact that EPA often exceeds the statutory time limit for considering a revision, enabling EPA to collect noncompliance penalties which may be unwarranted, violates congressional intent. Such an inequitable use of the penalty powers is neither called for nor authorized. Nor does the fact that sources can petition under section 304(a) to compel EPA to perform its duties act as a full safeguard. See Sec. 307(g). If the SIP is ultimately approved, the penalty assessed during the period between the end of the statutory time limit and the final approval is the result not of the source's failure to comply but of EPA's failure to act on time. We do not hold, however, as petitioners ask, that the penalty should be tolled once the statutory deadline for acting on revisions has expired. Otherwise, if the SIP were ultimately not approved, the source in noncompliance would benefit undeservedly.
 
 
 76
 We therefore remand EPA regulation 40 C.F.R. Sec. 66.3(c)(1) (1981) to the agency and direct that it develop a new regulation so that once the statutory deadline for acting on a SIP revision passes, the noncompliance penalty is held in abeyance pending final action on the SIP by EPA. Should EPA ultimately reject the SIP, the penalty should be calculated back to the deadline, with interest. Such a regulation will protect a source in compliance with air quality standards from the time EPA should have approved an eventually approved SIP revision and will remove any economic benefit accruing to a source not in compliance with the law if the SIP revision is not approved.
 
 B. "Owner or Operator" of a Source
 
 77
 Section 120 provides for the assessment of noncompliance penalties against any person who "owns or operates" a noncomplying source. EPA's regulations implementing section 120 define "owner or operator" to include:
 
 
 78
 any person who owns, leases, operates or supervises a facility, building, structure or installation which emits or has the potential to emit any air pollutant regulated by EPA under the Act.
 
 
 79
 40 C.F.R. Sec. 66.3(i) (1981). Industry petitioners object to the inclusion of lessees and supervisors in EPA's definition.[17]
 
 
 80
 The term "owner or operator" is not defined in section 120 or in the general definitional section of the Clean Air Act, 42 U.S.C. Sec. 7602 (Supp. IV 1980). The legislative history of the 1977 Amendments to the Act is silent both as to Congress' failure to define the terms and as to their intended meaning. "Owner or operator" is, however, defined in two specific sections of the Act, the sections dealing with the standards of performance for new stationary sources and the standards for hazardous air pollutants. In both cases, the definition includes lessees and individuals with supervisory power. See Sec. 111(a)(5). Industry petitioners would have us infer a negative: that because "owner or operator" is not defined to include lessees and supervisors in section 120, Congress chose to exclude them from the definition.
 
 
 81
 Such an inference is inconsistent with the purpose of section 120. Congress gave broad application to the statute and stated that any exemptions should be narrowly construed. Within such a statutory scheme, we cannot read legislative silence to mean creation of a unique usage. EPA's interpretation is sensible, and we affirm it here. The ordinary meaning of "operator" surely includes one who runs a facility as a lessee and one who supervises its operation. Were either of these categories omitted from the definition, EPA might be unable to assess penalties against the party that benefits from noncompliance. EPA would therefore be unable to achieve two central goals of section 120: ending the profits derived from failure to comply with the Act and equalizing the position of sources that have made the expenditures necessary to bring themselves into compliance with the Act with the position of sources that have not. The inclusion of lessees and supervisors enables EPA to target section 120 penalties as the statute intended, against those who benefit from violating the Act.
 
 
 82
 C. "Potential to Emit"
 
 
 83
 Because section 120 imposes more extensive liability on major stationary sources than on other sources, subjecting them to penalties for violations of any applicable SIP standard, the definition of "major stationary source" is a crucial factor in determining liability. Section 120 does not define "major stationary source," but the general definitional section of the Act stipulates that a stationary source is major if it "directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." Sec. 302(j). The regulations implementing section 120 track this definition. See 40 C.F.R. Sec. 66.3(g) (1981). The term "potential to emit" is not defined in either section 120 or in the general definitional section of the Act. EPA's regulations implementing section 120 define the term as follows:
 
 
 84
 "Potential to emit" means the capability at maximum design capacity to emit a pollutant after the application of air pollution control equipment. Annual potential shall be based on the larger of the maximum annual rated capacity of the stationary source assuming continuous operation, or on a projection of actual annual emissions. Enforceable permit conditions on the type of materials combusted or processed may be used in determining the annual potential. Fugitive emissions, to the extent quantifiable, will be considered in determining annual potential for those stationary sources whose fugitive emissions are regulated by the applicable state implementation plan.
 
 
 85
 40 C.F.R. Sec. 66.3(j) (1981). Petitioners object, first, that this definition measures emission potential on the assumption that a source is in continuous operation. Second, they contend that EPA improperly included so-called "fugitive" emissions--emissions that come from a source, but not from an identifiable "point" within it, such as a smokestack--in calculating the total emission level for a source.
 
 
 86
 EPA's effort to define "potential to emit" under section 120 was interwoven with its efforts to define the same term in rulemaking implementing the section of the 1977 Amendments setting forth standards to prevent significant deterioration of air quality, see 42 U.S.C. Sec. 7479(1) (Supp. IV 1980). EPA's original definition in those regulations measured a source's "potential to emit" by what it would emit, when operating at full capacity, in the absence of air pollution control devices. See 40 C.F.R. Sec. 52.21(b)(3) (1978). The original definition, in other words, ignored already-installed pollution control equipment in the determination of whether a source was to count as "major." This court rejected the definition, and directed EPA to "look to the facility's 'design capacity'--a concept which not only includes a facility's maximum productive capacity (a criterion employed by EPA) but also takes into account the anticipated functioning of the air pollution control equipment designed into the facility." Alabama Power Co. v. Costle, 636 F.2d 323, 353 (D.C.Cir.1979).
 
 
 87
 Like the original regulations implementing the Prevention of Significant Deterioration (PSD) section, EPA's proposed regulations implementing section 120 ignored air pollution control equipment designed into a facility. See 44 Fed.Reg. 17,319 (1979). The final section 120 rules, however, refer only to a source's "maximum design capacity," i.e., to what the source can be expected to emit, operating at full capacity, as it is designed. 40 C.F.R. Sec. 66.3(j) (1981). EPA made the change to conform the section 120 regulations both to this court's decision in Alabama Power and to EPA's ongoing efforts to promulgate PSD regulations. 45 Fed.Reg. 50,087 (1980).
 
 
 88
 EPA's original PSD regulations also assumed that fugitive emissions were to be included in the determination of what counts as a major source for purposes of PSD standards. In Alabama Power, this court held that the general definitional section of the Act requires rulemaking by EPA in any case in which a determination is made to include fugitive emissions in calculating whether a source is "major" for purposes of implementing a requirement under the Act. 636 F.2d at 370. The regulations were thus remanded to EPA for further rulemaking.
 
 
 89
 The final regulations implementing section 120 include fugitive emissions only to the extent that they are regulated under a SIP. That is, if SIP standards regulate fugitive emissions from a source, they count towards determining that source's potential to emit; otherwise, they do not. See 40 C.F.R. Sec. 66.3(j) (1981). EPA explained this choice, too, as an effort to conform the section 120 regulations to Alabama Power and to ongoing development of the PSD regulations. 45 Fed.Reg. 50,087 (1980).
 
 
 90
 EPA's new PSD regulations were promulgated within a month after the section 120 regulations and resemble them closely. They base potential to emit on maximum design capacity and include fugitive emissions for twenty-six categories of sources. 45 Fed.Reg. 52,752-43 (1980). A petition for review of the PSD regulations is pending before this court and settlement efforts are continuing. Chemical Manufacturers Association v. EPA, No. 79-1112 (D.C.Cir. filed Jan. 26, 1979). EPA has suggested that the outcome of the PSD proceedings may prompt revisions of the section 120 regulations. 45 Fed.Reg. 50,087 (1980). Such concerns, however, are purely speculative; our task here is to evaluate EPA's section 120 regulations on the current state of the law.
 
 
 91
 We affirm EPA's definition of "potential to emit." As to the decision to base potential to emit on maximum design capacity, we find it is reasonable in light of the statutory language and the remedial goals of section 120. The very term itself--"potential to emit"--is clear indication that Congress did not intend determinations of whether a source is "major" to be based on actual emissions in day-to-day operations. Sources that generally operate at only a fraction of capacity, if needs or economic conditions change, may suddenly function at a far greater level. If so, they will reap economic benefits of noncompliance concomitant with those of other sources operating at similar levels of capacity, and it is reasonable to penalize them in a similar manner. One of the important goals of section 120 was equalizing the competitive situations of polluters and nonpolluters, and EPA's definition of "potential to emit" advances that goal. Moreover, EPA's definition is consistent with this court's mandate in Alabama Power that a determination of whether a source is major for purposes of the PSD requirements should be based on maximum design capacity. 636 F.2d at 353. The flaw in EPA's original PSD regulations was that they ignored pollution control devices built into a source and hence measured the source as it would never be. EPA's section 120 regulations, however, measure the source as it can be at its fullest, and thus reasonably implement the statute.
 
 
 92
 EPA's treatment of fugitive emissions is also reasonable. Section 120 penalties against major stationary sources are to be assessed for violations of state SIPs. The use of SIPs to determine whether fugitive emissions should be included in calculating a source's potential to emit reasonably links the noncompliance penalties against major sources with the SIPs that give rise to their assessment.
 
 
 93
 Moreover, EPA has engaged in the rulemaking required for inclusion of fugitive emissions in the calculation of whether a source is major. See Sec. 302(j). In promulgating the PSD regulations, EPA assumed that the rulemaking requirement was inapposite. Here, by contrast, EPA followed SIP regulations in determining whether to include fugitive emissions. As we emphasized in Alabama Power, the purpose of the rulemaking requirement may have been to enable EPA to tailor the inclusion of fugitive emissions to particular industrial conditions. Adoption of a SIP involves an exploration of whether industrial conditions in that state warrant limiting fugitive emissions from a particular source. EPA's reliance on the SIP itself to determine whether to include fugitive emissions in the calculation of a source's potential to emit thus met the statutory rulemaking requirement, and we affirm that action.
 
 III. EXEMPTIONS FROM SECTION 120 PENALTIES
 
 94
 Being in violation of an applicable legal requirement does not automatically subject a source to section 120 penalties, as the statute sets out a number of exemptions to the noncompliance penalties. Five of these exemptions are mandatory, with the burden of proof on the source to show that it is entitled to the exemption it claims. Sec. 120(a)(2)(B)(i)-(v). EPA's regulations implementing two of the five mandatory exemptions are challenged here. The first of these is for noncompliance due solely to an inability to comply with an emissions standard, which inability is "entirely beyond the control of the owner or operator of such source or of any entity controlling, controlled by, or under common control with the owner or operator of such source," and for which inability the source has received a delayed compliance order under the Act. Sec. 113(d); see Sec. 120(a)(2)(B)(iv). The second exemption at issue is for noncompliance due solely to conditions by reason of which a temporary emergency suspension is authorized under section 110(f) or (g) of the Clean Air Act, such as one due to a national energy emergency. See Sec. 120(a)(2)(B)(v).
 
 
 95
 In addition to the mandatory exemptions, section 120 authorizes EPA to exempt a source from penalties for a particular instance of noncompliance if it finds that "such instance of noncompliance is de minimis in nature and in duration." Sec. 120(a)(2)(C). In contrast to the mandatory exemptions, this de minimis exemption is permissive only. This exemption is also at issue.
 
 
 96
 We take up in turn the issues raised by EPA's regulations implementing these exemptions. We find that the regulations overstepped the statutory mandate in one respect when interpreting the "inability to comply" exemption. In all other respects we affirm the regulations' treatment of the section 120 exemptions.
 
 A. The "Inability to Comply" Exemption
 
 97
 In passing the Act in 1970, Congress intended to spur the development of air pollution control technology. The Act was technology-forcing: it did not provide exemptions for sources unable to comply with requirements because the technology necessary was as yet undeveloped. When it became clear that optimistic hopes for technological advances in pollution control were not being entirely realized, Congress in the 1977 Amendments provided for delayed compliance orders. Sec. 113. Under these orders, sources making good faith efforts to come into compliance, but faced with immature technology, may continue operation and follow a more protracted schedule of compliance with emission limitations.[18]
 
 
 98
 In section 120, too, Congress built some flexibility into the penalty scheme for sources unable to meet applicable legal requirements. Such sources are entitled to exemptions if they can show that they meet two conditions: (1) their inability to comply is entirely beyond their control and (2) they have received a delayed compliance order under section 113. Sec. 120(a)(2)(B)(iv). Industry petitioners find flaws in EPA's regulations implementing both of these conditions.
 
 1. Factors Beyond the Control of a Source
 
 99
 Under the inability to comply exemption, a source is exempted from penalties if its failure to comply resulted, inter alia, from reasons entirely beyond its control. The statute does not list factors that are to trigger the exemption; it is entirely open-ended. During consideration of section 120, there was some debate over whether to enumerate the factors that would trigger the exemption. EPA had urged confining the list to a narrow set of factors, such as strikes, fires, embargoes, and natural disasters. 1977 HOUSE REPORT at 76, reprinted in 4 1977 LEGISLATIVE HISTORY at 2543. The House, however, decided to incorporate "some flexibility" into the exemption, because it was concerned that "[n]ot all possible unforeseen circumstances could be foreseen and expressly provided for in this provision." Id. The Senate likewise did not confine the inability to comply exemption to a set list of factors. Both the House and the Senate, however, were insistent that the exemption, like other exemptions, should be narrowly construed.[19]
 
 
 100
 EPA's regulation implementing section 120 enumerates seven factors that it will consider as beyond the control of a source:
 
 
 101
 (1) Act of God;
 
 
 102
 (2) Fire;
 
 
 103
 (3) Embargo;
 
 
 104
 (4) Strike;
 
 
 105
 (5) Inability to obtain capital, if that inability is the result of temporary market conditions;
 
 
 106
 (6) Failure of equipment to perform as designed, assuming expectations about performance were reasonable; and
 
 
 107
 (7) The complete inability of a supplier or contractor to furnish labor or materials.
 
 
 108
 40 C.F.R. Sec. 66.31(c)(1)-(7) (1981). Only if a source can show that it meets one of these conditions will EPA grant it an exemption for inability to comply.
 
 
 109
 Industry petitioners object, first, that this list should be expanded to include technological impossibility as a factor. EPA based its refusal to grant a general exemption for technological incapacity on its understanding of the technology-forcing character of the Act. See 45 Fed.Reg. 50,096 (1980). EPA recognized, however, the difficulties of assessing a penalty to reflect the economic benefits of noncompliance, when the technology was not yet available to outline the steps to be taken by the source to bring it into compliance. Estimating the costs of pollution control equipment, for example, may be impossible when it is not yet known what equipment will be necessary. EPA thus determined that
 
 
 110
 [w]here existing technology has not yet demonstrated compliance, the penalty will be based upon the cost of installing the best available controls as determined on a case-by-case basis, as well as a commitment to an appropriate research and development (R & D) program designed to develop the new means of emission control necessary to achieve the standards. Thus, a source that has taken and is continuing to take all possible steps to achieve compliance, including the installation of the best available controls and, where appropriate, participation in an appropriate R & D program, would be considered to be deriving no economic benefit from its failure to comply....
 
 
 111
 Id. EPA's approach, in other words, is to deny an exemption for technological impossibility but to calculate the penalties to ensure that sources doing their best to surmount existing technology will not be assessed any penalties. In EPA's judgment, this approach would provide the best mix of incentives to bring about the goals of the Clean Air Act: sources would be deterred from hiding their inadequate efforts behind the excuse of technological impossibility, and would be encouraged to take advantage of and build upon technological advances as they occur. Id. at 50,097.
 
 
 112
 We agree with EPA that it is reasonable to exclude technological impossibility from the inability to comply exemption. At no time during the debates did Congress consider enumerating technological impossibility as one of the factors triggering the exemption, nor did Congress move towards the more flexible formulation of the exemption in order to incorporate technological impossibility. Indeed, Senator Muskie's explanation of the version of section 120 that emerged from the Senate and House conference stated explicitly that the exemption was not intended to cover a claim that needed technology is unavailable. 3 1977 LEGISLATIVE HISTORY at 347. Congress' emphasis that exemptions should be construed narrowly, to avoid diluting incentives created by the penalty provision, was repeated.
 
 
 113
 Furthermore, EPA's approach is a reasonable balance of statutory goals. Congress intended the Act to create incentives to develop the technology needed to abate air pollution. Perhaps the best that can be expected from sources in pursuit of this goal is use of the best available technology and continued efforts to develop better technology. EPA's treatment of technological impossibility encourages this progress, and we affirm such treatment.
 
 
 114
 Industry petitioners' second objection is that EPA erred in enumerating an exclusive list. EPA chose this approach because it was concerned that including a "catch-all" provision would open a loophole and defeat the purpose of the penalty scheme. 45 Fed.Reg. 50,096 (1980). While we agree with EPA that eligibility for this exemption should be determined by regulation rather than by adjudication, we find that in relying on an exclusive list of factors to trigger the exemption, EPA has overstepped Congress' intent.
 
 
 115
 Although Congress intended the exemption to be narrowly limited, it also required that "some flexibility" be written into the regulations. See 1977 HOUSE REPORT at 76, reprinted in 4 1977 LEGISLATIVE HISTORY at 2543. EPA argues that this requirement of flexibility is fully met by its power to "expand in the future the list of situations that constitute inability to comply should this become necessary to prevent inequity in a particular case." 45 Fed.Reg. 50,096 (1980). EPA fails, however, to specify whether its power to prevent inequity has prospective application only. We hold that it cannot and that EPA must include in its enumerated factors a provision that allows it, in its discretion, to exempt a source in the first instance in which such circumstances arise. Without such a provision, the regulations lack the flexibility that the Act mandates.
 
 
 116
 There is no need for this provision to become the loophole EPA fears. The burden of proof is on a source to demonstrate that it meets the conditions of the exemption, which include a showing that the inability resulted from a factor entirely beyond the source's control. This is a heavy burden indeed, not subject to easy exploitation from sources claiming the exemption on spurious grounds.
 
 
 117
 We therefore remand the regulations to EPA insofar as they strictly enumerate an exclusive list of factors that will trigger the inability to comply exemption. We leave to the agency the fashioning of an additional provision to meet the congressional design.
 
 
 118
 2. "Controlling, Controlled By, or Under Common Control With"
 
 
 119
 To invoke the inability to comply exemption, a source must show that its inability was entirely beyond not only its own control, but also the control of those entities controlling it. In the language of section 120, the source must show that the "inability results from reasons entirely beyond the control of the owner or operator of such source or of any entity controlling, controlled by, or under common control with the owner or operator of such source." Sec. 120(a)(2)(B)(iv).
 
 
 120
 EPA's implementing regulations look to management structure to interpret this requirement. EPA defines "control" as follows:
 
 
 121
 "Control" (including the terms "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of a person or organization, whether by the ownership of stock, voting rights, by contract, or otherwise.
 
 
 122
 40 C.F.R. Sec. 66.3(f) (1981). The regulations provide that the source must demonstrate inability beyond its own control as well as the control of any "affiliated entity." Id. Sec. 66.31(a)(4). "Affiliated entity" is in turn defined in terms of direct or indirect control: "a person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the owner or operator of a source." Id. Sec. 66.3(b).
 
 
 123
 Petitioners claim that these definitions make no distinction between "actual" and "ostensible" control. They argue that it is not clear how much influence constitutes control and that EPA should have defined the terms "management" and "policies." Accordingly, they ask that we vacate and remand the regulations to EPA for an identification of the basis for so broad a definition of control.
 
 
 124
 We disagree. The relevant issue in terms of the inability to comply exemption is fact oriented, focusing on the source's actual use of, or failure to use, its power. It is neither feasible nor desirable to force EPA to define in the abstract regulations for all possible factual circumstances. The question of whether a source, or an affiliated entity, used its power to create its inability to comply or could have so used its power to comply is properly left to the factfinder. Therefore, we affirm the regulations as to these definitions.
 
 3. Receipt of a Delayed Compliance Order
 
 125
 The second condition that a source must fulfill to qualify for the inability to comply exemption is that it must have received a delayed compliance order under section 113(d). EPA's regulations provide that a source may not receive the exemption unless it has already received such an order, or the equivalent in the form of a consent decree. 40 C.F.R. Sec. 66.31(a)(4) (1981). Industry petitioners object, claiming that they should be entitled to an exemption if they have petitioned for a delayed compliance order and their petition appears meritorious.
 
 
 126
 We affirm EPA's determination that a source must already have received a delayed compliance order to qualify for the exemption. The statutory language is unequivocal: "for which inability the source has received an order under section 113(d)." Sec. 120(a)(2)(B)(iv). The choice of the past tense is clear indication that Congress meant to limit the exemption to cases in which a source had passed through the carefully defined procedures of section 113, and we affirm.
 
 B. Temporary Emergency Suspensions
 
 127
 The other mandatory exemption which petitioners challenge allows for an exemption if the failure of the source to comply is due solely to "the conditions by reason of which a temporary emergency suspension is authorized under [section 110(f) or (g) ]." Sec. 120(a)(2)(B)(v). The sections in question--Secs. 110(f), (g)--authorize suspensions of state implementation plans by the President or the governor in case of an energy or economic emergency. EPA's regulations implementing this exemption, 40 C.F.R. Sec. 66.31(a)(5), (b) (1981), limit the applicability of the exemption to instances when the suspensions have issued.
 
 
 128
 Industry petitioners object to the regulations and argue that the statute mandates the exemption whenever a suspension could be granted. Such an interpretation would create an administrative nightmare, forcing EPA to second-guess governors or the President. EPA's regulations, on the other hand, requiring that the suspension actually have been granted, are a reasonable interpretation of the statute given that what authorizes a suspension is the executive decision to issue it. Therefore, we affirm EPA regulations 40 C.F.R. Sec. 66.31(a)(5), (b) (1981).
 
 C. De Minimis Exemptions
 
 129
 The final exemption challenged is the "de minimis exemption." Section 120 of the Act provides that:
 
 
 130
 [t]he Administrator may, after notice and opportunity for public hearing, exempt any source from the requirements of this section with respect to a particular instance of noncompliance if he finds that such instance of noncompliance is de minimis in nature and in duration.
 
 
 131
 Sec. 120(a)(2)(C). EPA's regulations, 40 C.F.R. Secs. 66.32, 66.33 (1981), define the phrase "de minimis in nature and duration," by setting out those factors EPA will consider in assessing a request for the exemption. These include the magnitude and recurring nature of the violation, the steps being taken to prevent recurrence, the potential economic benefit, the character and impact of the violations, and the duration. Id. Sec. 66.32(c)(1)-(5) (1981). There is also a list of factors to be considered specifically in the case of equipment malfunction. Id. Sec. 66.33 (1981).
 
 
 132
 Industry petitioners argue that the statute limits EPA to two criteria in ruling on an application for noncompliance: the duration and the nature of the incident causing the noncompliance. They claim that if these two criteria are met the EPA Administrator must grant an exemption. Accordingly, they argue that EPA, by specifying additional criteria for the Administrator to consider, has gone beyond its statutory mandate.
 
 
 133
 Petitioners' argument simply turns the statute upside down. The congressional intent is clear that, unlike the exemptions discussed in parts III A and III B of this opinion, the de minimis exemption is discretionary. Whereas the exemptions listed in section 120(a)(2)(B) "shall" be granted if the requirements are met, the de minimis exemption "may" be granted if the requirements are met. Congress' intent is also clear from the type of hearing it established. Section 120(b)(5), which applies to the mandatory exemptions in section 120(a)(2)(B), requires the Administrator to provide a "hearing on the record." Section 120(a)(2)(C), which applies to the de minimis exemption, merely requires that there be "notice and opportunity for public hearing." Moreover, EPA's regulations relate directly to the objectives of the Act and section 120 because they look at the air quality impact and the associated economic benefit of each violation. As such, they are reasonable characterizations of the "nature" of a violation for determining whether it should be viewed as de minimis. For the foregoing reasons, we affirm the EPA's regulations, 40 C.F.R. Secs. 66.32, 66.33 (1981), that deal with the de minimis exemption.
 
 IV. PROCEDURAL ISSUES
 
 134
 Although section 120 authorizes EPA to promulgate regulations for the assessment and collection of noncompliance penalties, the basic format for these procedures is well laid out in the statute itself. The statute provides that sources not in compliance with applicable emission limitations are to be given "a brief but reasonably specific notice of noncompliance" by July 1, 1979, or 30 days after the discovery of noncompliance, whichever is later. Sec. 120(b)(3). They are then to be required to calculate the amount and schedule of penalty payments, and to submit the results, together with information necessary for independent verification, to EPA within 45 days. Sec. 120(b)(4)(A). Instead of submitting the penalty calculation, a source receiving a noncompliance notice may choose to submit a petition within 45 days that challenges either the notice of noncompliance itself or asserts entitlement to one of the exemptions allowed under section 120. Sec. 120(b)(4)(B). In the event of such a petition, the agency is required to provide a formal hearing on the record and make a decision on the petition within 90 days. Sec. 120(b)(5). Exemptions with respect to particular de minimis instances of noncompliance are also available, after "notice and opportunity for public hearing." Sec. 120(a)(2)(C). Penalties once implemented may be adjusted, after notice and opportunity for a hearing on the record. Sec. 120(b)(8).
 
 
 135
 Section 120, in combination with section 307 which concerns judicial review under the Act, sets out certain aspects of the right to judicial review. "Any action" pursuant to section 120 is a final action "for purposes of judicial review of any penalty under section 307 of this Act." Sec. 120(e). The powers of the court to stay actions under section 120, however, are curtailed.
 
 
 136
 In any action respecting the promulgation of regulations under section 120 or the administration or enforcement of section 120 no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.
 
 
 137
 Sec. 307(g). Petitions for review of rules promulgated under section 120, or other "nationally applicable" final action taken under the section, may be filed only in the United States Court of Appeals for the District of Columbia. Sec. 307(b)(1). Petitions for review of state plans for implementation of section 120, or regionally applicable actions under section 120, may be filed only in the appropriate local circuit. Id. All such petitions must be brought within sixty days of publication in the Federal Register, or within sixty days of the grounds for the petition. Id.
 
 
 138
 EPA, in keeping with the statute, has promulgated regulations implementing these procedures. Industry petitioners challenge four of these regulations: (1) the regulations allowing EPA to deny a hearing on a petition for exemption, the adjustment of a penalty, or a challenge to the issuance of a notice of noncompliance; (2) the regulations providing that the hearing on a de minimis exemption be informal; (3) the regulations relating to waiver of issues; and (4) the regulations defining which agency actions are final for the purpose of judicial review. We will treat each issue in turn; and, with the exception of the first set of regulations, we affirm EPA in all respects.
 
 A. EPA Denial of Hearings
 
 139
 The position taken by both respondent EPA and petitioners is that the discretion of the EPA Administrator to deny a hearing is the same regardless of the issue involved. EPA stands by its regulations, 40 C.F.R. Secs. 66.23(b), 66.41(a)(2), 66.53(c) (1981), allowing the Administrator to deny a hearing if the petition is unsupported. Petitioners, on the other hand, argue that the Administrator has no discretion to deny a hearing if one is provided for by statute and requested by a source. Although we agree with petitioners that the Administrator has no discretion to deny a hearing if the petition challenges a noncompliance notice or a reassessment by EPA of the penalty or alleges an entitlement to exemptions, we agree with EPA that if a petition by a source for reconsideration of a penalty assessment is unsupported the Administrator may deny a hearing. Because we do not agree completely with either party's contentions, we will treat each regulation separately.
 
 
 140
 1. Petitions Challenging Noncompliance Notices or Alleging Entitlement to Exemptions
 
 
 141
 EPA regulation 40 C.F.R. Sec. 66.41(a)(2) (1981) provides that, if the petition "presents no information regarding the issues of whether the source is in violation of applicable legal requirements or is entitled to exemption which, if true, would alter the liability of the source owner or operator," a hearing on the petition may be denied. Petitioners argue that this regulation is inconsistent with section 120(b)(5) which requires the Administrator to provide a hearing on the record if a petition is submitted. EPA argues that the regulation is consistent because "as administered, the bare denial of EPA's preliminary findings on assertion would [sic] given agency practice [sic] suffice to put in issue the facts asserted so that a hearing would result." EPA Response to Order Requesting Information Dated June 30, 1982, at 2 (July 9, 1982). The Response goes on to state, however, that the Administrator can request additional information under 40 C.F.R. Sec. 66.41(a)(4) (1981) and that, if the information would not alter the liability of a source, the Administrator can deny the hearing.
 
 
 142
 We agree with the petitioners that EPA's regulation is inconsistent with the statute. The regulation cannot, as EPA claims it can, both allow the Administrator to deny a hearing if no information is presented and require the Administrator to grant a hearing, given agency practice, if no information is presented. The statute clearly states a hearing is required. EPA's regulation does not. Therefore, we remand 40 C.F.R. Sec. 66.41(a)(2) (1981) to the agency and direct EPA to develop a new regulation such that the Administrator is required to grant a hearing if a source files a petition challenging the notice of noncompliance or alleging entitlement to an exemption.
 
 
 143
 2. Petitions Challenging an EPA Reassessment of a Penalty
 
 
 144
 EPA regulation 40 C.F.R. Sec. 66.53(c) (1981) authorizes the Administrator to "deny a hearing [on a petition challenging a penalty reassessment by EPA] to the extent he concludes that the petition of the owner or operator does not present information which, if true, would alter the amount of the penalty." The statute clearly states, however, that the Administrator may readjust a penalty only after "notice and opportunity for a hearing on the record." Sec. 120(b)(8). The statute gives EPA no leeway here, and neither can we. The regulation is remanded.
 
 
 145
 3. Petitions Seeking Reconsideration of a Penalty Assessment
 
 
 146
 EPA regulation 40 C.F.R. Sec. 66.23(b) (1981) authorizes a source owner or operator to petition the Administrator to accept a revised penalty calculation but states that "[t]he decision to accept the interim calculation or to grant a hearing on this issue shall be solely within the discretion of the Administrator." The statute does not speak to attempts by a source to lighten its penalty load; nor is there evidence that Congress intended such a burdensome hearing requirement. Sources have a right to a hearing when their penalty is assessed or reassessed by EPA. The statute does not entitle them to a second chance. We hold, therefore, that EPA's regulation is reasonable and entirely proper in this instance.
 
 
 147
 Before turning to the other procedural issues involved, we note that petitioners have challenged EPA regulation 40 C.F.R. Sec. 66.4 (1981) which states that issues that could have been raised in this proceeding may not be raised in a petition filed in an individual section 120 proceeding. This regulation tracks the review provisions of section 307(b)(2) which states that:
 
 
 148
 [a]ction of the Administrator with respect to which review could have been obtained under [section 307(b)(1) ] shall not be subject to judicial review in civil or criminal proceedings for enforcement.
 
 
 149
 42 U.S.C. Sec. 7607(b)(2) (Supp. IV 1980). To allow review of the legal requirements in an administrative proceeding under section 120 would allow a source to circumvent the sixty-day time limit for seeking judicial review of section 120 regulations. Sec. 307(b)(1).[20] There is no denial of due process here, as the petitioners are able to and have challenged the validity of the regulations in this proceeding. We hold that regulation 40 C.F.R. Sec. 66.4 (1981), which limits review to this proceeding, is neither arbitrary nor capricious and we therefore affirm it.
 
 B. The De Minimis Exemption Hearing
 
 150
 Under the statute, EPA may grant de minimis exemptions following notice and opportunity for a public hearing. Sec. 120(a)(2)(C). As noted in part III C of this opinion, the de minimis exemption, in contrast to other exemptions set out in section 120, is discretionary. In addition, this exemption is to be granted after opportunity for a public hearing, rather than a mandated hearing on the record. The regulations implementing this exemption provide only for an informal hearing. 40 C.F.R. Secs. 66.32(d), 66.33(d) (1981). Petitioners challenge these regulations, arguing that a formal adjudicatory hearing is required.
 
 
 151
 Congressional intent is clear, however, that the hearing is meant to be informal. The statute omits the key words triggering formal adjudication: the stipulation that the hearing be "on the record." It does so despite requiring a hearing on the record in the case of the other, mandatory exemptions in section 120. The inclusion of the word "public" in section 120(a)(2)(C) merely indicates that Congress intended for the Administrator to have the benefit of comments as to whether EPA should exercise its discretion to forego the penalty. In addition, because the exemption is discretionary, a mandatory formal hearing would matter little because the Administrator could still refuse to grant the exemption. For the foregoing reasons, we affirm the regulation.
 
 C. Waiver of Issues
 
 152
 Upon the issuance of a noncompliance notice, the owner or operator of a source must either calculate the amount of the penalty due and submit that calculation with the supporting data, or submit a petition contending that the source is not in violation, is entitled to an exemption, or both. If the source owner or operator opts to submit a petition, he must, according to EPA regulation 40 C.F.R. Sec. 66.13(a)(2) (1981), "present both grounds in the petition if he wishes to preserve a claim to an exemption in the event that the source is found to be in violation," or the claim will be deemed waived. The petition may be amended (1) within forty-five days; (2) upon consent of the Administrator; or (3) after forty-five days if based on new and unforeseeable conditions. 40 C.F.R. Sec. 66.13(c) (1981). Petitioners argue that these provisions exceed EPA's statutory authority under the Clean Air Act.
 
 
 153
 EPA has the power to control its own procedures, so long as it does so consistently with its statutory mandate and the ultimate constitutional guarantees of due process. This regulation is well within the statutory mandate and is a reasonable means for EPA to ensure that the hearing process is orderly and swift. Under section 120(b)(5), EPA must act on petitions within ninety days. EPA could not be expected to meet the deadline if petitioners could amend petitions at will once they are submitted.
 
 
 154
 With regard to the constitutional guarantees, the regulation does not, in the abstract, violate due process, although a refusal by the Administrator to consent to a particular amendment might. The regulation does not foreclose amendments in the event of new and unforeseen circumstances. Moreover, the petition may always be amended with the consent of the Administrator. In affirming this regulation, we follow the holding of the Supreme Court in Hodel v. Virginia Surface Mining, 452 U.S. 264, 304, 101 S.Ct. 2352, 2374, 69 L.Ed.2d 1 (1981), that the proper place to raise the issue whether a particular denial of an effort to raise an issue abridged due process is in the context of the particular case.
 
 D. Final Actions
 Section 120(e) provides:
 
 155
 [a]ny action pursuant to this section, including any objection of the Administrator under the last sentence of subsection (b) [allowing the Administrator to impose substitute noncompliance penalties upon disapproval of a penalty assessed under a state scheme] shall be considered a final action for purposes of judicial review of any penalty under section 307 of this Act.
 
 
 156
 The EPA regulation, 40 C.F.R. Sec. 66.81 (1981), implementing this section defines the procedures that must be followed to obtain action EPA considers administratively final. These procedures provide that final actions by the Administrator may not be reviewed until judicial review of the penalty eventually imposed is sought. Petitioners argue that this regulation limits the jurisdiction of the federal courts and exceeds the Administrator's authority.
 
 
 157
 Although section 120(e) is not worded as clearly as possible, the intent of Congress does appear to have been to allow judicial review only after a final decision on penalties. The final clause of section 120(e) states that it is "for purposes of judicial review of any penalty." This interpretation also follows from Congress' clear intent to see that penalties were swiftly assessed and collected. With this in mind we affirm EPA's regulation as a reasonable effort at implementing section 120(e).
 
 V. CALCULATION OF THE PENALTY
 
 158
 Both section 120(a)(1)(A) and section 120(d)(2)(A) direct the Administrator to promulgate regulations providing for the assessment of noncompliance penalties. The form these regulations is to take is spelled out in section 120(d). Section 120(d)(2) specifies that the amount of the penalty assessed cannot be less than (1) the "economic value" of delay past July 1, 1979, including the avoided costs of capital debt service and operation and maintenance, plus (2) any "additional economic value," minus (3) expenditures not already accounted for made for the purpose of achieving or maintaining compliance. Section 120(d)(3)(A) mandates that the penalty be paid in equal quarterly installments during the period of noncompliance. This period is to begin no later than the date of the issuance of the noncompliance notice and is to end when the source comes into compliance. At the end of the period of noncompliance a final adjustment is made in the penalty to bring it into line with actual expenditures and economic benefits. Sec. 120(d)(4). Although the statute provides for reimbursement or additional payments, the object of the regulations is to project as closely as possible the benefits a source is likely to derive through noncompliance. It is for this reason that EPA developed a mathematical penalty calculation model.
 
 
 159
 Industry petitioners do not disagree with the use of a model, nor do they challenge the parameters used in constructing the model. They do contest, however, the use of certain assumptions concerning the data to be plugged into the model. They argue that these assumptions will lead to overassessments of penalties and that the final readjustment will not reflect actual benefits because the interest rate on overpayments is the average rate of interest on Treasury notes during the period of noncompliance rather than the rate of return on equity (the interest rate on underpayments).
 
 
 160
 Petitioners also complain that the penalty assessment does not include in its base or as a credit all expenditures made that reduce the economic value of noncompliance. They argue primarily that expenditures made on interim control devices and extra control measures should be included. Finally, they argue that outlays made by a source to come into compliance should be treated on a dollar-for-dollar rather than a prorated basis.
 
 
 161
 For the purpose of clarity we will treat each issue separately, but note at the outset that we affirm EPA in all relevant respects.
 
 A. Data Assumptions
 
 162
 Petitioners challenge three separate data assumptions: (1) that industry-wide rather than company-specific data should be used for the rate of return on equity; (2) that the inflation rate should not be allowed to exceed the rate of return on equity; and (3) that the cost of financing an investment is best measured by the company's long-term debt-equity ratio rather than the cost of any particular debt or equity instrument.
 
 
 163
 1. Rate of Return on Equity and Industry Averages
 
 
 164
 Faced with the question whether a source's past investment performance or the current investment opportunities available to the industry as a whole would better predict future returns on investment, EPA opted for the industry-wide averages, see 45 Fed.Reg. 50,137-39 (1980), despite the fact that it requires source-specific data for the marginal income tax rate and the debt-equity ratio. EPA's choice requires sources to pay the same penalty regardless of recent investment history. Petitioners argue that it is unreasonable to assume that the investment opportunities available to the industry as a whole represent the opportunity available to a particular source. EPA argues, however, that the past performance of an individual firm may have been influenced by non-recurring factors and that the industry-wide averages can be verified far more easily. We are unable to say that EPA's choice was arbitrary or capricious and thus affirm the use of industry-wide rather than company-specific data for the rate of return on equity.
 
 2. Inflation Rate v. Return on Equity
 
 165
 EPA's model assumes that in the long run the inflation rate will not exceed the rate of return on equity. EPA admits that in the short run inflation may outstrip investment returns, making compliance expenditures rather costly to a company, but argues that the appropriate time frame to consider is the long run. See 45 Fed.Reg. 50,134-35 (1980). Petitioners argue, nonetheless, that the model should be adjusted to allow a source owner to demonstrate that the use of an inflation rate higher than the rate of return is appropriate to its circumstances. In affirming EPA's decision to operate in light of the long run assumption as neither arbitrary nor capricious, we note that the situation industry envisions is more likely to occur when the period of noncompliance is short and when the resulting penalty adjustments will occur relatively quickly.
 
 3. Long-term Debt-Equity Ratios
 
 166
 EPA assumes that the best data for determining the cost of investment is a source's average debt-equity ratio for the last five years, see 45 Fed.Reg. 50,140 (1980), but admits that this may cause the model to overestimate temporarily the benefits of noncompliance to a company that chooses to finance pollution control equipment with low-cost development bonds. This choice is based on the assumption that, due to investors' behavior, firms tend to maintain an equilibrium debt-equity ratio over the long run. In addition, EPA does take into account the availability of development bonds when calculating the interest rate to be applied to debt, even if it does not when projecting an individual company's capital structure. EPA's choice is reasonable, and we affirm it.
 
 
 167
 4. The Interest Rate on Overpayments and Underpayments
 
 
 168
 Once a source has come into compliance, its penalty payments cease and a final readjustment is made. If an overpayment has been made, the source is entitled to a refund; if an underpayment has been made, an additional payment is assessed. These refunds and assessments include "interest at appropriate prevailing rates (as determined by the Secretary of the Treasury)." Sec. 120(d)(4)(A), (B). In accordance with the Secretary of the Treasury's directive, EPA maintains that the interest on underpayments is the rate of return on equity, while the rate for overpayments is that equal to the average rate of interest on Treasury notes over the period of noncompliance. See 45 Fed.Reg. 50,094 (1980).
 
 
 169
 Petitioners argue that, because the rate on overpayments may be lower than that of the rate of return on equity, overpayment could yield penalties in excess of the value of delayed compliance. EPA does not contest this, but argues that the overpayer is taking, in effect, advantage of the fact that its investment is placed in the relatively risk-free hands of the Treasury. Although we are not convinced that this particular dual interest structure is the wisest policy, we hold that EPA has reasonably implemented the statutory mandate which directs that the interest rates be set by the Secretary of the Treasury.
 
 
 170
 B. Expenditures that Reduce the Economic Value of Noncompliance
 
 
 171
 Section 120 provides for a credit against quarterly penalty assessments of
 
 
 172
 the amount of any expenditure made by the owner or operator of that source during any such quarter for the purpose of bringing that source into, and maintaining compliance with, such requirement....
 
 
 173
 Sec. 120(d)(2)(B) (emphasis added).
 
 
 174
 Petitioners argue that the statute mandates that expenditures on interim control devices or on control measures in addition to those needed to achieve compliance be credited against the penalty. EPA maintains that only expenditures made in furtherance of meeting the standards imposed by law can be credited, and constructed the model accordingly.
 
 
 175
 EPA's argument that the statute assesses penalties for benefits derived from the failure to meet legal pollution standards enumerated in the statute is well-taken. Increasing stack heights and dispersion techniques, while costly, do not reduce emissions levels and should not be credited. The main focus of the Act is to ensure swift and steady movement towards meeting federal and state standards that have been honed through the regulatory process. It is not to encourage self-determination in the process of pollution control. EPA's refusal to give credits for interim or extra expenditures that do not reduce emissions levels is in complete accord with the statute. The same is true of EPA's refusal to give credit for interim or extra expenditures that do reduce emissions but do so by means that are unrelated to the controls needed to achieve final compliance. Section 120(d)(2)(B) limits the granting of credits to expenditures made "for the purpose of bringing that source into, and maintaining compliance with" the applicable legal standards. The legislative history makes clear that this limitation includes only those expenditures made for the "incremental costs necessary to come into compliance." 3 1977 Legislative History at 346. (Sen. Muskie).
 
 
 176
 The question arises, however, as to the proper treatment of interim control devices that are needed to achieve final compliance and do reduce the economic value of noncompliance. EPA has said that expenditures for such devices will be credited, lowering the penalty assessment. See 45 Fed. Reg. 50,109 (1980). We believe that this is the proper treatment and hold EPA to this reading of the statute. With this in mind, we affirm EPA's treatment of the various kinds of expenditures for interim or extra control devices.
 
 C. Dollar-for-Dollar Credits
 
 177
 Section 120(d)(2) provides for the calculation of the penalty minus those expenditures made for the purpose of bringing a source into, and of maintaining, compliance, but only to the extent that those expenditures have not already been taken into account in the calculation of the penalty. Industry petitioners argue that this section mandates that expenditures be credited on a dollar-for-dollar basis. On the other hand, EPA argues that its choice of a prorated, rather than a dollar-for-dollar, credit is clearly authorized by the statute and is consistent with the penalty calculation model. We agree.
 
 
 178
 Section 120 does not explicitly state whether particular expenditures are to be subtracted from or calculated into the penalty assessment. It merely says that the expenditures credited should not have been already taken into account in the calculation of the penalty. Petitioners' contention would, in all probability, wipe out the penalty once a source begins significant outlays directed toward compliance. In contrast, EPA's use of a prorated credit takes account of the fact that it is the time value, not the absolute value, of the economic benefit that is relevant to penalty calculations. Petitioners' argument that the statute requires dollar-for-dollar credits is incorrect, and we affirm EPA on this issue.
 
 VI. SAFETY VALVE
 
 179
 We turn, then, to petitioners' final argument--that section 120 mandates the existence of a "safety valve: a mechanism whereby sources are permitted to show that the individual facts of its [sic] case warrant individualized treatment," Petitioners Brief at 6. Petitioners, in effect, interpret the statute to require case-specific results: i.e., that EPA be as correct as possible about whether an individual source is entitled to an exemption and about what a source should pay for its noncompliance. We cannot accept this argument.
 
 
 180
 Section 120 sets forth specific exemptions from the imposition of noncompliance penalties. It does not suggest a general exemption. Congress did not intend for the scope of exemptions to be determined by adjudication rather than by regulation, nor did Congress intend to have these regulations reviewed on a piecemeal basis instead of at their inception in a single threshold proceeding. In addition, as noted in part III A of this opinion, the regulations implementing the inability to comply exemption must include a catch-all provision. Beyond this, we do not feel the statute mandates individualized treatment in terms of exemptions.
 
 
 181
 With regard to the assessment of penalties, we note that the statute makes provision for both underpayments and overpayments by a source. See Sec. 120(d)(4). If the penalty is out of line, it can also be adjusted during the period of noncompliance. Moreover, EPA's regulations merely track the statute which says that, at a minimum, penalty assessments should include the benefits of capital investments and maintenance expenses foregone. There was no showing by petitioners that the model would project widely excessive penalties nor that the statute mandated a waiver to ensure that the method of projecting the benefits of noncompliance exactly fit the circumstance of each case. Here, unlike section 301 of the Federal Water Pollution Control Act Amendments, section 120 does not provide for variances. See E.I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Consequently, we will not insert any. In this respect, EPA is affirmed.
 
 CONCLUSION
 
 182
 In 1977, Congress added section 120 to the Act to supplement the system of civil and criminal sanctions enacted in 1970. Section 120 establishes a penalty assessment system whereby sources not in compliance with the applicable legal requirements of the Act are fined in accordance with the economic value of that noncompliance. EPA was directed to and eventually did promulgate a series of regulations implementing this section of the statute. Three of those sets of regulations exceeded the mandate and must be remanded: the regulations concerning the payment of penalties during EPA consideration of a proposed SIP, the regulations implementing the "inability to comply" exemption, and the regulations dealing with the Administrator's discretion to deny a hearing on the record. In all other respects we affirm the regulations promulgated by EPA.
 
 
 183
 It is more than five years since Congress enacted this section; it is certainly time to put into operation the penalty assessment system Congress mandated.
 
 
 184
 It is so ordered.
 
 
 
 [1]
 The Clean Air Act specifies that petitions for judicial review of nationally applicable rules implementing section 120 may be filed in this court only. Sec. 307(b)(1), 42 U.S.C. Sec. 7607(b)(1) (Supp. IV 1980). Such petitions must be filed within sixty days of promulgation of the rules, as these were, unless they are based on new grounds arising after the sixty-day period. These cases as consolidated, therefore, treat all challenges to the July 28, 1980 rulemaking that were timely raised within the sixty-day period, with the exception of three issues on which briefing has been deferred by this court pending the outcome of settlement negotiations. The three deferred issues are: the model for calculating noncompliance penalties assessed against utilities; the use of a thirty-year time horizon to calculate the estimated useful life of equipment for which pollution control devices are needed; and the relationship between the provision for noncompliance penalties when emission limitations have been stiffened, Sec. 120(g), 42 U.S.C. Sec. 7420(g) (Supp. IV 1980), and the provision allowing delayed compliance with ambient air quality standards for photochemical oxidants and carbon monoxide when a state demonstrates that the standards cannot be attained on the schedules required, Sec. 172(a)(2), 42 U.S.C. Sec. 7502(a)(2) (Supp. IV 1980)
 EPA's regulations implementing section 120 specify that challenges to the regulations themselves that could have been raised in petitions for judicial review during the sixty-day period may not be initiated during hearings on assessments of noncompliance penalties against individual sources of pollution. 40 C.F.R. Sec. 66.4 (1981). The regulations note in particular that sources may not, in individual hearings, argue either that the regulations impermissibly narrow the statutory provisions for exemptions from the regulations, id. Sec. 66.4(a), or that the regulations set out an inaccurate method for calculating the penalties, id. Sec. 66.4(b). Industry petitioners claim that this limitation is arbitrary and capricious, but we find that it is not. Sources have been offered the opportunity to seek judicial review of the regulations in these proceedings, in an orderly manner and in the forum provided by the statute. There is no reason for EPA to allow the regulations to be challenged piecemeal, over and over again. Indeed, because assessments of section 120 penalties against individual sources are reviewable only in the circuit in which the source is located, Sec. 307(b)(1), to allow such individualized challenges to the regulations themselves could undercut the entire scheme of review set up for section 120, see Joint Explanatory Statement of the Committee of Conference, in 3 A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977 at 502, 518-20 (1978) [hereinafter 1977 LEGISLATIVE HISTORY]; cf. Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654, 660 (D.C.Cir.1975).
 
 
 [2]
 Current ambient air quality standards are set out at 40 C.F.R. Secs. 50.1 to 50.12 and Appendices A to H (1981); see, e.g., Lead Indus. Ass'n v. EPA, 647 F.2d 1130 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980)
 
 
 [3]
 In 1970, Congress simply provided that separate federal standards should be adopted for new sources, Pub.L. No. 91-604, Sec. 111, 84 Stat. 1676, 1683-84. The 1977 Amendments to the Clean Air Act considerably stiffened the requirements for federal new source performance standards. See infra note 8 and accompanying text
 
 
 [4]
 E.g., Clean Air Amendments of 1977, S.REP. NO. 127, 95th Cong., 1st Sess. 12 [hereinafter 1977 SENATE REPORT], reprinted in 3 1977 LEGISLATIVE HISTORY at 1386
 
 
 [5]
 See, e.g., D. CURRIE, AIR POLLUTION: FEDERAL LAW AND ANALYSIS Sec. 6.01 (1981); Bleicher, Economic and Technical Feasibility in Clean Air Act Enforcement Against Stationary Sources, 89 HARV.L.REV. 316 (1975); Silver, Problems in Attempting to Translate Statutory Standards into Emission Limitations Under Air and Water Pollution Control Legislation, 22 VILL.L.REV. 1122 (1977)
 
 
 [6]
 See, e.g., 1977 SENATE REPORT at 17, reprinted in 3 1977 LEGISLATIVE HISTORY at 1391; Comment, Technology Forcing under the Clean Air Act: the Electric Utility Dilemma, 38 U.PITT.L.REV. 505 (1977)
 
 
 [7]
 See, e.g., Clean Air Act Amendments of 1977, H.R.REP. NO. 294, 95th Cong., 1st Sess. 72 [hereinafter 1977 HOUSE REPORT], reprinted in 4 1977 LEGISLATIVE HISTORY at 2539 U.S.Code Cong. & Admin.News 1977, p. 1077
 
 
 [8]
 Current new source performance standards are set out at 40 C.F.R. Secs. 60.1 to 60.424 and Appendices A to D (1981). See, e.g., Sierra Club v. Costle, 657 F.2d 298 (D.C.Cir.1981) (upholding EPA's Sec. 111 standard for coal-fired power plants); National Lime Ass'n v. EPA, 627 F.2d 416 (D.C.Cir.1980) (remanding EPA's standard for the lime and lime hydrate industry)
 
 
 [9]
 A state administering the section 120 penalty program must provide a hearing on a petition that is "substantially similar" to a federal hearing on the record. Like EPA, the state must act within ninety days on any petition challenging the penalty assessment. State decisions may be reviewed by EPA sua sponte or on application by the petitioning source. In the latter case, EPA must act to review the state determination within sixty days. Sec. 120(b)(5), (6)
 
 
 [10]
 The original House version of section 120 was identical to the present version, except for the omission of the parenthetical language. H.R. 6161, 95th Cong., 1st Sess., reprinted in 4 1977 LEGISLATIVE HISTORY at 2016-17. The version introduced in the Senate was stronger, and provided for automatic adjustment of all Clean Air Act enforcement orders to include noncompliance penalties. S. 252, 95th Cong., 1st Sess., reprinted in 5 1977 LEGISLATIVE HISTORY at 3598. The conference compromised on the House version, which targets the noncompliance penalties against major sources and limits the liability of smaller sources to violations of certain specified federal air quality standards. See Joint Explanatory Statement of the Committee of Conference, 3 1977 LEGISLATIVE HISTORY at 518-20
 
 
 [11]
 An example of such a consent decree is Alabama v. TVA, No. 77-P810-NE (N.D.Ala. Oct. 16, 1979), submitted to this court as an attachment to TVA's Brief. The decree sets out a schedule of specific steps to be taken by TVA's Widows Creek Steam Plant and Colbert Steam Plant to bring them into compliance with sulfur dioxide and particulate emission limitations in Alabama's SIP. Penalties are to be assessed under the decree should TVA fail to take any step required by the decree. Id. at 23. Otherwise, however,
 [t]he obligations of TVA under this consent decree are in full and final satisfaction of any and all claims and causes of action alleged in the complaints heretofore filed in these actions, or arising out of the matters alleged in these actions, or contained in this consent decree, including any and all claims for state civil penalties and fines, and for federal civil penalties arising under Section 113 of the Clean Air Act.
 Id. at 26-27.
 
 
 [12]
 With certain enumerated exceptions, states do not have the power to take any action modifying any requirement of their SIPs, without approval from EPA. Sec. 110(i), 42 U.S.C. Sec. 7410(i) (Supp. IV 1980). One of the exceptions is that a state may issue an order allowing a source unable to comply with SIP requirements to follow a delayed compliance schedule, such as the schedule in a consent decree, with notice to the source of the possibility of section 120 penalties. Sec. 113(d)(1)(E), 42 U.S.C. Sec. 7413(d)(1)(E) (Supp. IV 1980)
 
 
 [13]
 See, e.g., Tennessee Thoracic Society v. Freeman, No. 77-3286-NA-CV (M.D.Tenn. Dec. 22, 1980), reprinted in Brief of Petitioner TVA, Addendum; Alabama v. TVA, No. 77-P810-NE (N.D.Ala. Oct. 16, 1979), reprinted in Brief of Petitioner TVA, Attachment
 
 
 [14]
 Petitioner ARMCO's facial challenge to the constitutionality of section 120 is based on the manner in which the penalties are assessed. ARMCO contends that allowing the penalties to accrue from the date of the notice of noncompliance, throughout the period of administrative and judicial review, is an unconstitutional deprivation of property without due process of law, because the pendency of the penalties will deter sources from exercising their full rights to seek review. It is not a challenge to the power of Congress to impose some form of noncompliance penalty on sources in violation of requirements of the Clean Air Act
 ARMCO's challenge, moreover, is without merit. ARMCO's contention is that because the penalty begins to accrue from the date of the notice of noncompliance, and because the first payment following an administrative determination of liability is due six months after the notice of noncompliance, the penalty will deter sources from seeking review. ARMCO also objects that failure to pay the noncompliance penalties will subject sources to further penalties. Sec. 120(d)(5), 42 U.S.C. Sec. 7420(d)(5) (Supp. IV 1980).
 ARMCO relies on Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), but the analogy ARMCO draws is mistaken. In Ex parte Young, the Supreme Court held that the imposition of a penalty was a violation of the due process clause of the fourteenth amendment because of the unique structure of the statute creating the penalty. Minnesota had created a Railroad and Warehouse Commission, with power to fix maximum rates within the state. Stiff penalties, including fines and imprisonment of up to five years, were to be imposed for any violations of the rates as set, but the rates were not independently reviewable. Thus, the only way for a railroad to seek review of a rate was to incur the penalties. This structure, the Court held, unconstitutionally interfered with the railroads' right to seek review of a stipulated rate:
 The company, in order to test the validity of the acts, must find some agent or employe to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts (either state or Federal) for the purpose of testing its validity. The officers and employes could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them in case the court should decide that the law was valid. The result would be a denial of any hearing to the company.
 209 U.S. at 145-46, 28 S.Ct. at 447-48; see also Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920) (statutory scheme that allows legislatively set laundry rates to be reviewed only on pain of incurring contempt penalties violative of due process); Wadley Southern Ry. v. Georgia, 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915) (railroad that failed to invoke available judicial review proceedings for challenging rates but chose to disobey instead is properly liable for contempt penalties).
 These situations are not analogous to the case at hand. The Act explicitly provides sources with the opportunity to challenge air quality standards--the analog of the rates in Ex parte Young--without incurring penalties. Sec. 307(b), 42 U.S.C. Sec. 7607(b) (Supp. IV 1980). Should a source be penalized for violation of a standard contemporaneously subject to legal challenge and ultimately determined to be invalid, the source will be entitled to a refund of the penalty. See Sec. 120(d)(4)(A). Unlike the penalties in Ex parte Young, which were triggered by any effort to seek review of the underlying legal requirement, the section 120 noncompliance penalties are simply penalties that accrue during the period in which the alleged violator contests his liability to the penalty. Such penalties are common; for example, penalties for violations of the Occupational Safety and Health Act accrue during the period of judicial review of liability, 29 U.S.C. Sec. 666(d), (l ) (1976). They are valid, assuming the source is accorded adequate opportunity to challenge their assessment at the administrative level before payment must begin. See infra pp. 465-471.
 
 
 [15]
 The arguments of industry petitioners are more relevant to post-1977 consent decrees that purport to settle section 120 liability. Although we are not aware of any instance in which EPA has assessed a section 120 penalty against a source operating under a consent decree that purports to settle section 120 liability, we note that such a practice would be of dubious validity
 
 
 [16]
 This issue is pressed by petitioners Duquesne Light Company and Pennsylvania Power Company, joined by the American Iron and Steel Institute and the Chemical Manufacturers Association
 
 
 [17]
 EPA objects to our review of this issue, contending that industry petitioners did not raise the issue with sufficient specificity during the section 120 rulemaking to preserve their rights to seek judicial review. See Sec. 307(d)(7)(B); see also Recreation Vehicle Indus. Ass'n v. EPA, 653 F.2d 562, 573 (D.C.Cir.1981). We have reviewed the record, however, and conclude that the issue was raised in comments by PPG Industries, Inc., a member of petitioner Chemical Manufacturers' Association, Inc. Joint Appendix (J.A.) 883
 
 
 [18]
 See, e.g., 1977 SENATE REPORT at 44-48, reprinted in 3 1977 LEGISLATIVE HISTORY at 1418-22
 
 
 [19]
 See, e.g., 1977 HOUSE REPORT at 76, reprinted in 4 1977 LEGISLATIVE HISTORY at 2543; 1977 SENATE REPORT at 49-50, reprinted in 3 1977 LEGISLATIVE HISTORY at 1423-24; 3 1977 LEGISLATIVE HISTORY at 347 (remarks of Senator Muskie)
 
 
 [20]
 See supra note 1