DUQUESNE LIGHT
COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Alabama Power Company, et al., (Utility Intervenors) Duquesne Light Company, et al., (Industry Intervenors) Natural Resources Defense Council, Inc., Intervenors.

PENNSYLVANIA POWER
COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

OHIO EDISON COMPANY, Petitioner,

v.

Lee M. THOMAS, Administrator, Environmental Protection Agency, et al., Respondents.

ALABAMA POWER COMPANY, et al., Petitioners,

v.

Lee M. THOMAS, Administrator, Environmental Protection Agency, et al., Respondents.

ALABAMA POWER COMPANY, et al., Petitioners,

v.

Lee M. THOMAS, Administrator, Environmental Protection Agency and Environmental Protection Agency, Respondents.

ALABAMA POWER COMPANY, et al., Petitioners,

v.

Lee M. THOMAS, Administrator, Environmental Protection Agency and Environmental Protection Agency, Respondents.

Nos. 80–2103, 80–2123, 80–2181, 80–2190, 81–1836 and 84–1386.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1986.
Decided May 27, 1986.

Henry V. Nickel, Washington, D.C., with whom Andrea Bear Field, Jeffrey N. Martin, Robert A. Emmett, Washington, D.C., J. Jeffrey McNealey and Christopher R.

Schraff, Columbus, Ohio, were on the joint brief, for petitioners, Duquesne Light Co., et al. in Nos. 80–2103, 80–2123, 80–2181, 80–2190, 81–1736 and 84–1386.

Bonnie A. Sullivan, Atty., Dept. of Justice, with whom Francis Blake, Gen. Counsel, E.P.A., Dean K. Dunsmore, Atty., Dept. of Justice and Christopher C. Herman, Atty., E.P.A., Washington, D.C., were on the brief, for respondents in Nos. 80–2103, 80–2123, 80–2181, 80–2190, 81–1736 and 84–1386.

Richard E. Ayres and Ronald J. Wilson, Washington, D.C., were on the brief, for intervenor, Natural Resources Defense Council, Inc. in Nos. 80–2103, 80–2123, 80–2181, 80–2190, 81–1736 and 84–1386.

Paul Rodgers, Charles D. Gray and Genevieve Morelli, Washington, D.C., were on the brief, for amicus curiae, Nat. Ass'n of Regulatory Com'rs, urging remand, for revision in Nos. 80–2103, 80–2123, 80–2181, 80–2190, 81–1736 and 84–1386.

Before ROBINSON, Chief Judge, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

## I.

In *Duquesne Light Co. v. Environmental Protection Agency*, 698 F.2d 456 (D.C. Cir.1983) (*Duquesne I*), this court considered twenty consolidated petitions for review of regulations promulgated by the Environmental Protection Agency (EPA) pursuant to the Clean Air Act Amendments of 1977. Pub.L. No. 95–95, 91 Stat. 685 (codified in scattered sections of 42 U.S.C. § 7401 *et seq.*) ("Amendments"). Those regulations provide a model for the assessment of penalties against entities that fail to comply with the Clean Air Act's pollution limitations. The penalties that the model calls for are designed to recoup the economic benefits those entities derive by failing to comply with the Clean Air Act's

requirements. In *Duquesne I* we upheld the penalty assessment model's propriety in most respects. However, briefing was deferred on three issues that we hoped the parties would settle through negotiations. *See Duquesne I* at 461 n. 1. Two of those deferred issues were settled. Today we decide the remaining issue: the legality of the model used for calculating noncompliance penalties assessed against regulated utilities. Although the question is not entirely free from doubt, we are satisfied that the EPA's regulations comply with the statutory mandate under which they were adopted.

## II.

The Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("Act"), provides for national standards on the level of air pollutants. Act § 109, 42 U.S.C. § 7409. These standards are implemented through a procedure that limits permissible emissions from stationary sources, including power plants operated by public utilities. Act § 110, 42 U.S.C. § 7410. The Act also provides for penalties for non-compliance. Section 120(d)(2) of the Act, added by the 1977 Amendments, authorizes the EPA to sanction polluters by assessing penalties

> designed to alter their economic behavior by changing the costs of emitting pollutants in violation of the applicable air quality standards.... [B]y removing the economic benefits of noncompliance with the Act, Congress hoped to place polluters on the same economic footing as those who had limited their emissions through increased anti-pollution expenditures.

*Duquesne I* at 463; *see generally id.* at 461–65.

Section 120 of the Act specifically provides that

> The amount of the penalty which shall be assessed and collected with respect to any source under this section shall be equal to—(A) the amount determined by the Administrator ... which is no less than the economic value which a delay in

compliance beyond July 1, 1979, may have for the owner of such source, including the quarterly equivalent of the capital costs of compliance and debt service over a normal amortization period, ... operation and maintenance costs foregone as a result of noncompliance, and any additional economic value which such a delay may have for the owner or operator of such source....

42 U.S.C. § 7420(d)(2).

In 1980 the EPA adopted regulations implementing § 120. 45 Fed.Reg. 50,086 (1980) (codified at 40 C.F.R. §§ 66.1 to 67.-43 and appendices). The regulations provide that "[a]ll noncompliance penalties shall be calculated in accordance with the Technical Support Document and the Manual." 40 C.F.R. § 66.21(a). That document in turn provides that "[f]or the purposes of noncompliance penalties, the economic value, or savings, from noncompliance is defined to have two components: (1) the return which can be earned on the capital costs of pollution control equipment whose purchase has been delayed, and (2) the operating and maintenance costs avoided as a result of not having installed the equipment and the return on these savings." Noncompliance Penalties, Technical Support Document, 45 Fed.Reg. at 50,123. It is readily apparent that the penalty assessment model set forth in the EPA's regulations is primarily based on the factors mentioned in the authorizing statute.

### III.

#### A.

Our standard of review is provided by section 307(d)(9) of the Act. That section provides that "[i]n the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; ... (C) in excess of statutory jurisdiction, authority or limitations, or short of statutory right...." 42 U.S.C. § 7607(d)(9). With that standard in mind, we now evaluate the petitioners' challenge to the EPA regulations.

The dispute in this case concerns the propriety of applying the EPA's § 120 penalty assessment model, upheld by this court in its general application, see *Duquesne I*, to regulated utilities. Petitioners here, regulated public utilities, urge this court to set aside the EPA regulations governing penalty assessment insofar as they apply to them. They claim that the EPA, to comply with § 120's mandate, must devise a special penalty calculation model for public utilities.

Petitioners argue that Congress' overarching desire in enacting § 120 was to ensure that polluters would be economically "indifferent" between polluting and paying the statutory penalty, on the one hand, and installing pollution control equipment, on the other. According to petitioners, penalties under § 120 should equal an amount that will have the same negative economic effect on the polluters as would complying with the Act's requirements. That is, penalties should be equal to the benefit or "economic value" of noncompliance. Petitioners assert that they suffer much more from a penalty than they would from incurring the same amount of pollution-control costs. Thus, they claim that applying a penalty-assessment model that equates economic value with savings frustrates Congress' plan that firms should be indifferent between penalties and compliance, at least with respect to public utilities. Such a penalty-assessment model allegedly misapplies § 120's requirement that penalties be set equal to economic value.

The petitioners' argument turns on the peculiar way in which costs are borne by regulated utilities. Public utility regulators govern the extent and manner in which public utilities are allowed to recover costs from their ratepayers. Petitioners assert that public utility regulatory bodies allow expenditures on pollution control equipment to be included in a utility's rate base and periodic costs to be passed through as expenses. Thus, the financial

impact of complying with the Act's emission standards is assertedly very small for public utilities that are permitted to recover their expenditures on pollution control equipment.

The regulatory treatment of fines imposed pursuant to § 120 will, according to petitioners, be very different. Although no such fines have in fact been incurred, petitioners believe that utility regulators will not allow § 120 penalties to be included in the rate base or passed through to the ratepayers as expenses. (The National Association of Regulatory Utility Commissioners, *amicus curiae* here, endorses this prediction.) Based on the disparate regulatory treatment of actual expenditures on pollution-control equipment and fines for noncompliance, petitioners argue that, for public utilities, the economic value of noncompliance is less than the direct cost avoided by noncompliance. Therefore, petitioners assert, a penalty commensurably lower will engender the desired indifference. Petitioners conclude that the differential impact on their finances of fines and costs requires the EPA to develop a special penalty-assessment model for public utilities. Only by using a special model, argue the petitioners, will Congress' goal of "economic indifference" be achieved.

Petitioners' challenge to the § 120 regulations is misconceived. Petitioners go on at great length about Congress' desire to assure, via the § 120 penalties, that firms would be economically indifferent between polluting and complying with the Act. Although petitioners' conclusions about § 120 are incorrect, they are essentially correct in describing its thrust. As we said in *Duquesne I*, "Congress hoped to place polluters on the same economic footing as those who had limited their emissions through increased anti-pollution expenditures." *Id.* at 463. Section 120 itself speaks of the "economic value" of noncompliance. It is not much of a leap to conclude that if the economic value of noncompliance is to be used in setting the noncompliance penalty, Congress desired to render polluters indifferent to obeying or disobeying the Act. If § 120 merely authorized the EPA to come up with penalties that would remove the economic incentive to continue polluting, the utilities might successfully argue that a penalty equal to the full cost avoided by failing to comply exceeds the statutory authorization.

What the petitioners fail to come to terms with, however, is the specific statutory mandate to include certain elements in the calculation of economic value. The statute specifies that "the capital costs of compliance" and "operation and maintenance costs foregone" are to be included in the § 120 penalty. The penalty-assessment model adopted by the EPA specifically includes these costs. We decline to hold that EPA regulations that follow the clear terms of the statute are arbitrary and capricious or contrary to law, even if the results may be more onerous for some polluters than for others.

Even if section 120 were not so clear as to the elements that are properly included in calculating noncompliance penalties, we think the petitioners would have an uphill battle. The legislative history of § 120 makes clear that Congress believed that § 120 penalties would have the sure and certain effect of eliminating any incentive to avoid compliance.

Representative Henry Waxman, a member of the conference committee that produced the Amendments, explained § 120 as follows:

> In order to speed compliance by industry, we are enacting a penalty applicable to each major source which will be equal to the economic value of noncompliance with emission limitations. No longer will ... our major utilities ... be able to reap an economic windfall from polluting the air. No longer will they find it cheaper to send their lawyers into court instead of purchasing and installing the necessary pollution control equipment.

3 A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977 335–36 (House Consideration of the Conference Committee Report, Aug. 4, 1977). Assessing a penalty equal to costs foregone will assure that no

incentive remains to delay compliance. That a lesser penalty might have done the job is irrelevant; a penalty equal to the cost avoided will always produce at least indifference.

Moreover, section 120 does not say, as the petitioners sometimes seem to argue, that noncompliance penalties should produce economic indifference. Rather, the section states as its general principle the idea that penalties should be "no less" than the "economic value" of noncompliance. It is not at all clear that economic value can be equated with the amount by which profits are reduced by incurring compliance expenditures. (Even petitioners do not suggest that this measure of economic value would be appropriate for firms selling in a competitive market. *See infra* part III B.) The calculation of profits is complicated, and the legislative history strongly suggests that economic value was understood as being a measure of costs foregone rather than net loss. That the Congress' use of "economic value" clashes somewhat with its allegedly primary goal of ensuring economic indifference is not a fatal flaw in the legislative scheme.

Thus, we think the penalty-assessment model adopted by the EPA accurately reflects the mandate of the Amendments' legislative history. Bearing in mind that agency interpretations of ambiguous statutes are to be upheld if they are permissible, we do not think the EPA's regulations would be impermissible even if section 120 were less specific. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). It strains credulity to believe that in adopting regulations that not only track the statute's terms so closely but also clearly achieve Congress' desire to assure compliance with the Act the EPA may have acted in an arbitrary or capricious manner or exceeded its statutory authority.

### B.

We pause to make clear that petitioners' argument about the unique economic circumstances of regulated public utilities has not been lost on us. The court understands clearly that it is the *differential* impact of fines and costs on public utilities that is at the heart of petitioners' complaint. According to the petitioners, economic indifference is achieved for an unregulated firm when fine and cost are equal. Because the unregulated firm can pass through to its customers an *equal proportion* of its various sorts of expenses (*i.e.,* the demand schedule faced by the firm is independent of its costs), it does not matter what that proportion in fact is or how it compares with the proportion of expenses that another firm, perhaps facing a different competitive environment, may be able to pass through.

Put another way, an unregulated monopolistic firm will be able to pass on to its customers a large fraction of any added expenses it is forced to bear. Conversely, a firm selling into a competitive market (a price-taker) will be forced to absorb expenses. Thus, for unregulated firms across the competitive spectrum, the effect of pollution control expenses and § 120 penalties of equivalent amount will be the same. Although the net benefit of noncompliance for a monopolist is not as great as the costs foregone, neither is the net cost of paying a penalty as great as the penalty.

This is not the case with public utilities. If Congress had mandated economic indifference in the sense that petitioners suggest, petitioners would be right that the unique circumstance of public utilities would merit unique treatment. Where petitioners' analysis fails, however, is in premising their argument on an incorrect notion of economic indifference. Congress understood the economic value of noncompliance to be roughly equivalent to the direct costs avoided by failing to comply. It is not for us to rewrite the statute and its legislative history to conform to petitioners' understanding of economics. If public utilities really benefit so little by failing to comply and suffer so much by bearing § 120 fines, it is open to them to

comply with the Act and avoid the problem altogether. Alternatively, petitioners are of course free to seek to have the Act amended to take explicit account of their unique circumstances.

## IV.

The Amendments and their legislative history make it clear that Congress was not constructing an econometric model when it fashioned section 120. Rather, Congress fashioned a new sanctioning mechanism to push polluters into compliance with the substantive provisions of the Act. That the sanction chosen may have an asymmetric effect on public utilities does not make it less applicable or less suited to furthering Congress' will. Applying the EPA's section 120 noncompliance penalties to public utilities is proper. It is well past time to put into effect the penalty assessment mechanism ordered by Congress. Accordingly, the petitioners' challenge is dismissed and the regulations at issue are affirmed.

*It is so ordered.*